UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **MR. & MRS. O., on Their Own Behalf** | : | **CIVIL ACTION No:** |
| **and as NEXT FRIENDS of J.O.,** | : | **3:20-cv-690 (VAB)** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **GLASTONBURY BOARD OF EDUCATION** | : | |
| **Defendant.** | : | **SEPTEMBER 30, 2020** |

**PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Plaintiffs (hereinafter "Parents") in this matter submit this Memorandum of Law in

Support of Plaintiff's Motion for Judgment on the Administrative Record, pursuant to Rule

7(a) of the Local Rules of Civil Procedure and Federal Rule of Civil Procedure 56(1)(a).

I.    **FACTUAL BACKGROUND**

Nine-year-old J.O. resides in Glastonbury and is eligible for special education

under the Other Health Impairment classification. B-46. He has been diagnosed with

Noonan Syndrome, developmental delays, cardiomyopathy, autism, apraxia, intellectual

disability, low tone, attention deficit hyperactivity disorder (ADHD), respiratory conditions,

and he is at risk for leukemia. T.6/28/19: 38; T.11/14/19: 15-16, 19. When J.O. was young,

he was constantly in and out of the hospital due to illness, he struggled to gain weight,

and he was sick nearly every day. T.6/28/19: 34. Due to J.O.'s diagnosis of Noonan

Syndrome and his cardiac history, he has a compromised immune system, he falls sick

with any exposure to a sick person, he becomes ill very quickly, when he is hospitalized,

he goes straight from the emergency department to the ICU, and he is prone to bleeding.

Id., 35-36, 43; T.11/14/19: 16. When J.O. gets even the common cold, it turns into

bronchitis or pneumonia and leads to emergency room intervention in order for J.O. to

survive.[1] T.11/14/19: 96. Indeed, J.O. has been airlifted twice. T.6/28/19: 85-86, 90. He has been described as a "dead man walking" due to his cardiomyopathy and the number of times he has had to be revived.[2] T.11/14/19: 18. When he was last in the public school several years ago, he was hospitalized due to a severe illness, and he has not returned to the public school since that time. T.6/28/19: 51. When describing J.O.'s medical history and profile, Dr. Maureen Onyirimba[3] of Lifespring Pediatrics stated that J.O. has gone

---

[1] In 2015, Dr. Amy Roberts, J.O.'s cardiovascular genetics physician, wrote the Coventry Board of Education (his then school district) explaining J.O.'s complex medical profiles and developmental delays. B-2 p. 2. Additionally, she explained that J.O. does not have the immune or cardiac reserve of a typical child and as such needed to be very careful to avoid inter-current illness which may compromise his medical status more severely than it would a healthy child. Id. She noted that, while in the public school, J.O. did not attend school at all for the entire winter months because of the risk of exposure to viral illnesses. Id., 2-3. In November 2015, Dr. Sarah Hodgson noted that J.O.'s immune function was limited and that he has struggled with several serious respiratory infections. B-41: 2. The Board acknowledged this information in their own psychological report from January 2019. Id. In February 2016, Dr. Ann Milanese, of Connecticut Children's Medical Center, wrote that J.O. has had significant respiratory infections related to the pulmonary aspects of Noonan Syndrome and when he becomes ill, he is quite unavailable for learning. P-3: 4. She further noted that when he was placed in the public-school setting, the large number of other students placed him at significant health risk. Id. She again wrote in 2017, further confirming that given J.O.'s genetic diagnosis his immune function is compromised and is extremely vulnerable to respiratory illnesses. P-11: 1.

[2] While at Breakthrough Magnet School in Hartford, J.O. was in a classroom of fifteen students and was pulled out for related services. B-1; T.6/28/19: 42. Due to illnesses, he had to spend more time out of school than in school; indeed, he was out for the entire last two months of school. T.6/28/19: 42; P-1; T.11/14/19: 25. Dr. Onyirimba stated that, although J.O. tried being with larger groups of peers, he could not access his education in those settings. Id.; P-2: 2.

[3] Dr. Onyirimba is the medical director of Lifespring Pediatrics in Southington and a practicing pediatrician and endocrinologist. T.11/14/19: 10-11. Dr. Onyirimba had never testified in a due process hearing prior to her testimony in this case and found that, in her experience, her recommendations are usually followed. Id., 14. Dr. Onyirimba stated that, due to J.O.'s complex medical history, it is very important to limit exposure to inter-current illness that may predispose him to prolonged inpatient admission. Id.

through quite a lot and he continues to go through a lot; he will have these conditions for the rest of his life and is very medically fragile.[4] T. 11/14/19: 17-18.

Noonan Syndrome is a genetic disorder which carries significant abnormalities, including facial dysmorphism, low tone, cardiac abnormalities, short stature, and a tendency to bleed. Id.,16. J.O.'s Noonan Syndrome has been complicated by heart malformation requiring heart surgery, gastroesophageal reflux and feeding issues, requiring a G-tube as J.O. cannot sustain nutrition orally, genitourinary abnormalities requiring surgery, and eye abnormalities also requiring surgery. Id.,17. Consequently, J.O. continues to have cardiomyopathy, has a tendency to have fluid buildup in his lungs, and is at a high risk of infection. Id.,17, 21. When J.O. gets sick, he decompensates very quickly. Id.,17. Also due to Noonan Syndrome, peers are generally not able to understand J.O. when he speaks. T.6/28/19: 39.

Moreover, according to Dr. Amy Roberts, testing at Boston Children's found J.O.:

to have significant vulnerabilities in the domains of cognitive development, language skills, fine and gross motor development, low frustration tolerance and difficulties with attention and focus.  [J.O.] is noted to have a limited attention span and is easily distracted.  He requires a lot of structure and redirection and visual accommodations to focus on tasks.  He continues to have significant feeding challenges and shows significant delays in his adaptive functioning.  In addition to his developmental and cognitive issues, [J.O.] is a medically fragile child.

B-39. Indeed, the Verbal Behavior Milestones Assessment and Placement Program (VB-MAPP) from January 2019 indicated that, despite J.O.'s consistent and marked progress,

---

[4] By "medically fragile," Dr. Onyirimba explained that she meant immunocompromised, without the ability to mount a response when sick and having a propensity to flood his lungs when he gets sick. T.11/14/19: 31. She added that he has lymphedema and that his lymphatic system is not fully developed to be able to mount an appropriate response. Id.  She explained that J.O. is able to use the back entrance to her office so as to avoid people in the waiting room and that his appointments are scheduled in such a way as to avoid contact with other patients. Id., 32.

he continued to have substantial limitations and did not present with the ability to work independently on academic tasks, an important skill to be able to function in a less restrictive environment. B-37. "Given the complexity of his health profile, any educational environment that [J.O.] attends must have highly-trained staff to support his well-being and ability to participate in mealtimes." B-37:13. The report attributed the fact that J.O. rarely engaged in maladaptive behaviors at the time of testing in part to his feeling of success in his current placement. B-37:12-13.

J.O. also has skeletal issues that require a back brace and visual issues requiring an eye patch. T.1/17/20: 29; T.1/22/20: 32-33. He has low muscle tone, is G-tube dependent, and has significant occupational therapy and physical therapy needs. T.11/14/19: 21. He further presents with distractibility and fatigues quickly. T.1/17/20: 29; T.6/28/19: 36; T.11/14/19: 21; T.12/2/19: 32, 38; T.1/22/20: 13, 18-19, 25, 28. J.O. is a charming child, but he uses memorized and scripted language and has very little social cognition. T.1/17/20: 29-30. He also perseverates on topics. Id. He can appear to have *learned* something when it is merely memorized for the short term and will not be retained in the long term; therefore, the specialized training of the staff who work with him is extremely important to make sure he is actually generalizing information. Id., 42.

Additionally, J.O. has extensive feeding needs and a diagnosis of gastroesophageal reflux; his swallowing is characterized by reduced oral muscular tone and impaired oral motor skills. B-15:1. He further presents with oral sensory difficulties which impact the types of food he will eat. Id. At Meliora Academy, his current therapeutic placement, J.O.'s feeding team consists of a speech language pathologist (SLP), occupational therapist (OT), Board Certified Behavior Analyst (BCBA), and nurse who

sees him every day. Id., 2; B-16: 2; T.12/2/19: 18. Upon J.O.'s entry to Meliora, his SLP and OT were trained extensively on his feeding history by his previous private SLP and BCBA. B-15: 2. Meliora developed highly individualized feeding guidelines to ensure consistency among staff in all steps of J.O.'s feeding sessions. Id.; P-44.

J.O. was placed at Meliora for the 2016-2017 school year pursuant to a confidential settlement agreement with a school district where he had previously lived. Meliora is an intensive therapeutic program, with highly trained special education teachers, BCBAs, multiple physical therapists (PTs), OTs, SLPs, art therapists and music therapists. T.1/17/20: 11. Given the transdisciplinary approach, every person on the team is cross-trained. Id. Meliora individualizes the curriculum to each student and focuses on relatedness skills so that children are able to become more independent. Id., T.12/2/19: 8.  Meliora staff work together to ensure that the student is able to use their skills across different domains.  T.12/2/19: 9-10; T.1/22/20: 9. All Meliora staff collect data on the students throughout the entire day so that they can adjust the approach if the data reveals that a student is struggling. T.12/2/19: 10-12. Meliora uses a variety of instructional approaches to ensure true learning and generalization, which is especially important for J.O. as he has a habit of often simply memorizing and repeating information, rather than generalizing the material. Id., 12-13, 17. At Meliora, J.O. has a special education teacher, a registered behavior technician (RBT), an SLP who works on his language based concepts, an SLP who works on feeding, an oral motor specialist, a PT to work on gross motor skills, an OT who works on activities of daily living and fine motor, an OT who works on feeding, a BCBA who oversees his behavior plan, and a relatedness instructor to work

on pre-social skills and being able to reciprocate with peers.[5] T.12/2/19: 29; T.1/17/20:

52.  Due to Meliora's transdisciplinary approach and scheduling flexibility, J.O.'s areas of

need can be targeted together; for example, he will often have a session run by an OT,

PT, and SLP, who all collaborate together. T.12/2/19: 192.  His team at Meliora is on-site

at all times, and they consult with each other on a daily basis. T.1/17/20: 19-20, 26. Also

critically important, at Meliora, J.O. is in his own classroom with no other students for both

academic and medical purposes. Id., 43, 52.

Upon transferring to Meliora, a licensed practical nurse (LPN) was assigned to J.O.

for the first month of school to determine his medical needs. B-5: 3. When he began at

Meliora, J.O. was significantly developmentally, socially, and academically behind his

peers. T.6/28/19: 52-53. His speech was limited to a few words, he was not able to eat

safely, and he had significant fine motor concerns, in addition to being globally

developmentally delayed. Id., 54. J.O. made significant progress after his first year at

Meliora, and it was also the first school year that he did not need to be hospitalized due

---

[5] By contrast, the Board's proposed program does not include relatedness services, and Glastonbury does not have relatedness professionals on staff.  B-46; T.2/12/20: 118.  In April 2018, Dr. Nancy Schwartz wrote that while J.O. mastered basic relatedness skills involving attunement, visual referencing, and coordination over the course of the 2017-2018 school year, he presented with deficits in social cognition that underlie the development of general understanding and implementation of social rules. B-61.  She stated that J.O. required careful programming through the seven stages of development to include self-awareness, episodic memory, experience sharing, and dynamic analysis. Id.  She stated without development in these areas, teaching of social rules would be mastered only in a rote manner and would not generalize to appropriate social settings and interactions.  Id.  J.O. has learned to interact with other peers at Meliora, and, like J.O., these peers have social challenges. Id.  Dr. Schwartz stated that being paired with like peers is beneficial for J.O.  Id.  At Meliora, the relatedness programming is overseen by the speech and language pathologist and a relatedness specialist.  T.12/2/19: 189. The relatedness programming is implemented with J.O. in different environments throughout the school and can include a similarly skilled peer with the ultimate goal of teaching him how to socially engage and participate with peers.  Id.

to illness since starting school.  Id., 56.  Meliora provided a safe learning environment and was able to keep him healthy while J.O. accessed his education and made friends with his peers. Id., 61.

For the next school year, the 2017-2018 school year, his then school district, Coventry, continued J.O.'s placement at Meliora through his individualized education program (IEP) upon the team determining that Meliora was an appropriate placement to meet his needs. P-14: 2. During the 2017-2018 school year, the family moved to Ellington, Connecticut, and J.O. remained at Meliora pursuant to his IEP which followed him to the new district. T.6/28/19: 65. Meliora's January 2018 progress report documented that Meliora was collecting data in one-minute intervals. B-8: 1. A spike in J.O.'s behaviors were noted when his primary staff was not available, and it was recommended that J.O.'s staffing remain consistent. Id., 8. Despite these behaviors, J.O.'s academic progress report indicated "much growth in the areas of reading readiness, basic mathematics, cognitive language, social and play skills, independent participation, group learning and collaborative skills."  B-9: 1. As a result, the Ellington Board of Education recommended a self-contained district program, which included an individualized classroom where J.O. would be the only student. T.6/28/19: 67. Neither J.O.'s medical team nor his family supported this move. P-26, P-29, P-39, P-40.

Specifically, in February 2018, Dr. Onyirimba again wrote that due to J.O.'s complex medical history, it is very important to limit exposure to inter-current illness and to a lot of peers at one time. P-26. On February 27, 2018, Dr. Roberts cautioned against "the ill-advised suggestion that he move to a new school," asserting that such a move "is at least a disservice to him and at most threatens to compromise the very real progress

he has made since September." P-29: 1-2. She stated that a move from Meliora would be "an indefensible decision and categorically the wrong choice for [J.O.]," as well as "highly inappropriate." P-29: 2. Based in part on the medical professionals' recommendations and concerns, J.O. remained at Meliora throughout the 2017-2018 school year and extended school year through his IEP with Ellington.  B-20.

In July of 2018, Mrs. O. informed Glastonbury Public Schools (Board) that the family would be moving to Glastonbury, Connecticut imminently and requested a planning and placement team (PPT) meeting to discuss J.O.'s educational program. T.6/28/19: 68; T.10/2/19: 26. Diana Kelley was the Director of Special Education for Glastonbury at the time, and she was responsible for ensuring that the Board complied with the requirements of the Individuals with Disabilities Education Act (IDEA). T.10/2/19 11, 13. Kelley admitted when she testified at the underlying due process hearing that she was unaware when making the PPT meeting decisions for J.O. that the last time he was in a public school program, he was placed on homebound tutoring because his immune system was not able to handle the public school environment. Id., 13, 28-29. She conceded through her testimony that J.O. was making progress at Meliora. Id., 39. She further testified that, when it comes to health issues of a student, it is very important to listen to medical providers, noting that they provide information about which the Board does not have expertise and that they can help provide information to staff in terms of areas of needs for students. Id.,16.

The Board held a PPT on August 31, 2018, and, per the IEP that was generated from that meeting, "the team recommend[ed] continue[d] placement at Meliora Academy." B-23 p. 2; T.6/28/19: 69. Although, the Pride program in Glastonbury Public Schools,

which the Board now claims is the appropriate placement, was in place in August 2018, this program was not considered or even mentioned at the PPT on August 31, 2018. T.6/28/19: 69; T.10/2/19: 32-33. Indeed, the Board did not discuss any in-district programs at all. T.6/28/19: 69; T.10/2/19: 32-33; B-23. Nevertheless, in a note dated August 31, 2018, the head nurse for Glastonbury Public Schools, stated that "student currently outplaced. Meeting with team to create IEP and plan to return to GPS school," establishing that the decision to return J.O. to public school was made without input of the Parents and medical professionals and was done so outside of a PPT meeting. B-52.

During the summer of 2018 when J.O. had been enrolled as a student in Glastonbury, Dr. Onyirimba completed a Health Assessment Record; she indicated that there were health concerns and heart problems and that she did not recommend that J.O. be in a public-school program, noting that J.O. is medically fragile and immunocompromised.[6]  T.11/14/19: 29-30, 31.  She added that he had problems with his vision, had difficulties with speech, required a back brace[7] and a health plan. B-10; B-20. It should have been clear to the Board, that for J.O., his medical and educational needs could not be separated.  T.1/17/20: 39.

---

[6] The Parents provided the school team with consent to speak with Dr. Onyirimba, who acts as the coordinator of J.O.'s medical team.  B-51; T.11/14/19: 34.

[7] Kristin Bergenty, PT and OT/PT supervisor at Meliora, testified that, at the January PPT meeting, the Board's physical therapist recommended removing J.O.'s back brace, but Meliora pointed out that the brace was medically necessary. Id., 6, 35. The Board did not change its recommendations after Meliora raised concerns.  Id.  Indeed, the Board failed to include J.O.'s brace in the IEP at all, even thought it was included in the IEP from Ellington.  B-20: 3. Bergenty testified that only J.O.'s orthopedic doctor could make a recommendation about weaning J.O. off of his back brace.  T.1/22/20: 94.

Meliora created a healthcare plan for J.O.'s placement, which was implemented in J.O.'s own classroom. B-6.  The plan lists his multiple and complex diagnoses including "alteration in cardiac output; R/T cardiovascular dysfunction; risk for infection R/T chronic health condition." Id. Meliora's healthcare plan includes precautions such as avoiding unnecessary exposure to persons exhibiting signs or symptoms of illness and clearly states that reassignment of staff may be necessary if anyone presents with illness. B-6; T.1/17/20: 31, 43. Meliora staff believe it is important to consider the recommendations of medical professionals when working with medically fragile students and "constantly refer to doctor recommendations." T.12/2/19: 15; T.1/17/20: 28-29. At Meliora, staff are hypervigilant about protecting J.O. from anyone who is not feeling well, and they check the health status of other students on a daily basis before deciding whether J.O. will be permitted to enter a group. T.1/17/20: 30-31, 39, 103; T.12/2/19: 17. There is even a sign on J.O.'s classroom door alerting anyone who does not feel well not to enter. T.1/17/20: 30.  Specifically, if a member of his support staff has a tickle in his or her throat, staff will be reassigned. T.12/2/19: 17. Michelle Caruso, a special education teacher at Meliora, said that when J.O. gets sick, any illness symptom is more exaggerated for him than for a typical person. Id., 17-18.[8]

Moreover, at Meliora, J.O. is able to have intervals of social interaction with other students who have the same or similar protocol. T.11/14/19: 58, 86; T.1/17/20: 60, 149. Caruso testified she knows the signs of impending illness in J.O.'s peers, and, when any of them present with signs, even if they are acting silly or getting foggy, they are distanced

---

[8] Caruso has a master's degree in special education and has a background of teaching both in public and private schools.  T.12/2/19: 7.  At Meliora, she has a caseload of only seven students, and she had worked with J.O. for two and a half years.  Id., 7, 15.

from J.O. Id., 18. Due to Meliora's strict protocols, J.O. was able to remain in school even during a flu outbreak in 2018 because he was protected from sick peers. T.1/17/20: 105. Further, Meliora's plan reflects that class locations, schedule and activities may need to be temporarily adjusted to maintain J.O.'s health and safety, which is possible because of Meliora's small size. B-6: 2; 1/17/20: 33. At Meliora, J.O. never would be at a table or in the same room with a person who has a cold; rather, he would receive the lesson in his individualized classroom or the sick peer would not attend a group with J.O. T.12/2/19: 19, 83; T.1/17/20: 39; T.1/22/20: 15, 24, 84, 90. Indeed, students coming back to school after being sick would continue to be kept away from J.O. for a time, as would students presenting with symptoms of seasonal allergies. T.1/17/20: 86-87. Caruso defined someone being sick as someone who has a cough or runny nose. T.12/2/19: 118. Meliora staff wash their hands before and after working with students and wipe down the tables with hospital-grade wipes on a regular basis. T.1/17/20: 33; T.1/22/20: 14-15.

Dr. Onyirimba testified to the importance of J.O. being in isolation in school because of his vulnerability to decompensation; she pointed out that J.O. had been unable to stay at his previous mainstream school because he would always get sick. T.11/14/19: 23-25. Dr. Onyirimba testified that J.O. needs his own classroom as he has at Meliora,[9] and she did not recommend that he be in a classroom with ten other students because of his struggles with maintaining attention and due to his health problems.[10]

_____

[9] In 2016, Dr. Onyirimba had recommended a class size of six students or less but changed her recommendation to less students because of how sick J.O. became even with that small number. T.11/14/19: 40, 72-73.
[10] The hearing officer suggests that Dr. Onyirimba believed that Glastonbury was proposing to have J.O. be in a mainstream classroom.  Hearing Officer Decision [HOD]: 12.  On the contrary, Dr. Onyirimba testified that she believed that the hearing concerned

Similarly, Caruso did not recommend that J.O. be placed in a classroom of eight or ten students, and she was concerned about having students coming in and out of the classroom all day, which was consistent with the testimony of Meliora's chief administrator, Lynne Guilmette, that J.O. has his own room because of both his medical needs and problems maintaining his attention in the presence of other students. T.11/14/19: 29, 33, 38, 79, 105-07; T.12/2/19: 31, 77-78; T.1/17/20: 43. Further, Kristin Bergenty, PT and OT/PT supervisor at Meliora, testified that J.O. would be distracted in a classroom of up to ten students and noted that he is distracted even around two other children. T.1/22/20: 19, 29. Guilmette testified that it would be very difficult for J.O. to be in a classroom where students and staff were coming in and out all day and that, for J.O., having his own classroom was nonnegotiable.[11] T.1/17/20: 43, 45. Caruso added that,

---

some conflict or concern about J.O.'s "placement at Meliora versus trying to mainstream him in Glastonbury schools." T.11/14/19: 41-42. As the hearing officer herself recognized, however, the Glastonbury Pride program is housed at the Nayaug School which "serves a population of about 500 mainstream students," and she noted that most of the students in Room 11 spend as much as 80% of their time in the mainstream environment of Nayaug School. HOD: 11, 12. Moreover, Dr. Onyirimba testified that she would not recommend that J.O. be in a class of ten students, that, in her medical opinion, he could not be in a class with up to ten students, and that none of J.O.'s medical professionals was saying that he could be in a public school program and in a classroom of up to ten students. T.11/14/19: 33-34, 99. Moreover, Dr. Onyirimba explained that her concerns about such a classroom stemmed both from the increased risk of infection and because of J.O.'s distractibility. T.11/14/19: 105-06; see also T.12/2/19: 23. Even Kelley testified that a setting can impact how a student performs and noted that knowledge and comfort with staff members can also impact performance. T.10/2/19: 46. Kelley further acknowledged that J.O. frequently struggles to complete tasks in a noisy setting and that, when he is districted, it impacts his learning. Id., 47; P-44. Vanhaaften-Argens agreed that the Pride program could be loud and that there were behavioral students in the class. T.11/14/19: 147-48. When J.O. is around students with behaviors, he becomes overly interested in them; he is sensitive to noise and screaming.  T.12/2/19: 38; T.6/28/19: 78.

[11] Guilmette testified that Meliora is very systematic about moving students out of a one-to-one room. T.1/17/20: 124.

because J.O. has his own classroom, they can control the germs, J.O. has his own toys, and they can keep the room as clean as possible. T.12/2/19: 32.

Dr. Onyirimba also testified that none of J.O.'s medical providers recommended that he return to public school, noting that J.O. cannot be educated if he is on a ventilator.[12] T.11/14/19: 34-35. She recommended having a trained nurse help with feeding due to J.O.'s tendency to hemorrhage.[13] Id., 37, 91. She further noted J.O.'s difficulty coping with transitions. B-45. Dr. Onyirimba stated that J.O. is doing well at Meliora, as evidenced by the fact that he has not been as sick as he used to be in the past and is able to attend school in winter months. T.11/14/19: 37-38; B-57; B-71. In fact, Meliora is the first placement that did not result in J.O. being homebound or hospitalized due to illness. T.6/28/19: 91. Even when he has fallen sick at Meliora, he is able to quickly bounce back due to their proactive approach at identifying his needs. Id., 91-94.

In anticipation of a January 30, 2019 PPT meeting, the Parents sought and obtained letters from three members of J.O.'s medical team regarding their recommendations concerning J.O.'s school placement.  In a letter dated on January 8, 2019, Dr. Peter Townsend of Connecticut Children's Medical Center's Gastroenterology Group praised the gains that J.O. had made and urged keeping J.O. in his current

---

[12] Dr. Onyirimba added that J.O. has to be alive to be educated: "If you're having an asthma episode, you're in intensive care getting the nebulizer 24/7, education becomes very secondary.  For my patients, they have to be healthy enough, they have to be able enough, before they can get educated." T.11/14/19: 34-35, 80.

[13] Although the Glastonbury head nurse testified that she thought it would be a good idea and despite Kelley's testimony that they were going to bring in a part-time LPN to work with J.O., the district did not propose an LPN as part of J.O.'s program at the PPT meeting; nor was a nurse included in the January IEP. T.1/22/20: 160-61; T.10/2/19: 113; T.2/12/20: 133.  The Glastonbury head nurse confirmed that, if there were an emergency situation when J.O. needed his feeding, there would be no one else in the building to support the nurse who is responsible for all 500 students in the school. T.1/22/20: 169.

placement at Meliora, noting the level of services and support necessary given the Noonan Syndrome that underlies his feeding difficulties.[14] B-35. In a separate letter dated January 24, 2019, Dr. Roberts reiterated her previously expressed concerns about "the ill-advised suggestion that he move to a new school." B-39. She added that J.O.'s successes "are not evidence that the job is done but, rather, that the individualized program at Meliora is what he has needed and continues to need." Id. She stated that J.O. is medically fragile and recommended that J.O. remain at Meliora in his current placement with the current level of support, noting that, "to disrupt this program would be highly inappropriate." Id. In a third letter dated January 29, 2019, Dr. Onyirimba wrote that J.O. "remains medically fragile and does not cope well with transitions." B-45. She added that changing his placement at that point in the school year would be "ethically unacceptable" and that possible placement revision was, "at best, ill-advised and [did] not take into account his overall well-being;" she recommended that he remain at Meliora as that was the appropriate placement. Id.

Despite testifying that a doctor's opinion should be a part of the PPT discussion and acknowledging having received all three letters prior to the PPT meeting on January 30, 2019, Kelley testified that the Board "did not read all three letters, no," and that "[o]ne letter was considered at the – was reviewed and considered."[15] T.10/2/19: 21, 59, 77-78.

---

[14] Dr. Townsend's letter was given to the Board prior to the PPT meeting but was not reviewed. T.10/2/19: 59.

[15] Similarly, Anita Russell, administrator of pupil services in Glastonbury, testified that it is important to consider medical professionals' recommendations when working with medically fragile students and to listen to the recommendations of the staff who work with the student, and she acknowledged that J.O.'s doctors recommended that he remain at Meliora. T.2/12/20: 75, 109-10, 136. She also testified that, were J.O. to come to Pride, Glastonbury would make its own health plan by collaborating with his treating physicians,

In their letter to amend the minutes, the Parents pointed out that the letters were never discussed during the PPT and that the Board's attorney merely confirmed receipt of them at the end of the meeting and stated that they would be added to J.O.'s file. B-48: 3.

In the January 30, 2019 PPT meeting, the Board proposed a change in placement for J.O. from Meliora to the Pride program at Glastonbury's Nayaug Elementary School. B-46: 2. The Parents had significant concerns with the Board's proposed program and requested continued placement at Meliora. B-46: 2-3. Mrs. O, after hearing about the Pride program, goals and objectives proposed by the Board, testified that she did not believe that the Board had an understanding of her son since many of the goals that were proposed had already been mastered at Meliora and that the Pride program did not appear comprehensive enough to meet J.O.'s needs. T.6/28/19: 76-78, 192-93. Meliora raised concerns at the PPT about placing J.O. in a classroom of up to ten students (as would be the case at Pride) given his academic and medical needs, but the Board did not make any changes to its proposed plan. T.12/2/19: 78;215; T.1/17/20: 59,71; T.6/28/19: 79. Rather, the Board remained steadfast in its recommendation to return J.O. to Glastonbury Public Schools despite the concerns raised by J.O.'s medical team via their letters, as well as the concerns flagged by Meliora staff and the Parents.  Following this meeting, the Parents filed for due process on April 10, 2019 and invoked stay-put.

---

but she acknowledged that the January IEP did not note that Glastonbury would implement its own health plan. T.2/12/20: 143-45. The meeting summary indicates that Diana Kelley, Glastonbury director of special education, said that Glastonbury would implement the same health protocols as Meliora, even though J.O. has an entirely different program at Meliora, including his own classroom, and Meliora's healthcare plan was designed for that setting. B-46: 3; T.2/12/20: 142.

Standing in stark contrast to the conditions and protocols of J.O.'s program at Meliora are the facts and circumstances pertaining to the Pride program. Specifically, according to Glastonbury Public Schools' guidelines, if a child has a cold with mild symptoms including a stuffy nose, sneezing or mild cough, it is recommended that he or she attend school. B-53: 9; T.1/22/20: 236-37; T.2/12/20: 114. Susan Vanhaaften-Argens, special education teacher for the Pride program, confirmed that, if another student in the classroom had a cold, the student would remain in the Room 11 classroom with J.O., even at the same table, unless the nurse deemed that it was not appropriate for that child to be in school. T.11/14/19: 149-51. At Nayaug Elementary, which includes the Pride program, there is one nurse assigned to a building of approximately 500 students.  T.1/22/20: 129-130.

Jane Megson, head nurse for Glastonbury Public Schools, testified that that she did not have any experience with Noonan Syndrome, was unaware of how Noonan Syndrome affects J.O.'s immune system, and had not seen the type of interventions J.O. needs implemented at the Pride program before. Id. 124, 132, 136, 164, 220. Despite years of doctors concluding otherwise and even the testimony of the Glastonbury Director of Special Education that J.O. was immunocompromised, Megson testified that she did not believe J.O. to be immunocompromised; she also admitted to not knowing how much more susceptible J.O. is to an illness as compared to other children.[16] Id., p. 133-34, 166; T.10/2/20: 19. Megson further testified that she was not aware how J.O.'s cardiomyopathy impacted him, how quickly he decompensates if he gets sick, or how susceptible he is to

---

[16] The IEP from the January 30, 2019 PPT meeting even documents that J.O has a compromised immune system.  B-46.

an illness. T.1/22/20: 166. Despite all of the evidence to the contrary, Megson stated that, she would not define him as a medically fragile student because she does not believe he has any medical diagnosis that is associated with a decreased immune response. Id., 167, 220. Megson concluded that she did not believe that J.O. needed any level of care beyond what the school does for all of its students. Id., 177. Specifically, she explained that if a student were sick in a hallway near J.O., it would not be sanitized unless the sick student had vomited. Id., 173-74. She further asserted that it was her judgment that J.O. could sit at the same table as a child with a cold. Id., 178. Notwithstanding these assertions, she expressed her belief that the Board could implement the healthcare plan that Meliora used for J.O., despite the facts that Meliora was a program with 53 students where J.O. had his own classroom with a 1:1 instructor and the Board's proposed program was housed in a building with approximately 500 students where J.O. would not have his own classroom. Id., 168.  Notably, Megson first testified that the flu does not have an incubation period, but then seemed to backtrack stating that she would have to look it up. Id., 224, 227-28. She also was unaware of a standard distance someone with a cold should stand from others so as not to spread the illness. Id., 232.  She further testified that a structure, such as a cubby wall, could only stop the spread of a cough through the air "to some extent. . . ." Id., 228, 233.

With regard to the particulars of the Pride program, the testimony revealed that ten or eleven students are in the "contained" Pride program which contains five work-spaces,[17] and students and teachers would be coming in and out of the classroom all

---

[17] Kelley's representation at the PPT meeting that each student has his/her own workstation is inconsistent with Vanhaaften-Argens' testimony that the classroom only

day.[18] T.11/14/19: 129, 131, 138, 148; T.10/2/19: 61, 65; T.12/2/19: 77; see also B-46: 3 (IEP describing Pride as including up to ten students in classroom). Indeed, Pride staff work with children outside of the program; the PT, SLP, and BCBA even work in other buildings with other students. T.11/14/19: 123, 124-25; T.2/12/20: 123. Additionally, the students in the Pride program spend time in regular grade-level classrooms.  T.11/14/19: 127.  The Pride classroom contains students in grades K-5, and almost all of the students are on the autism spectrum. T.10/2/19: 168; T.2/12/20: 89. Vanhaaften-Argens testified that students had left Pride to attend Meliora in the past and that the Pride classroom can be loud and busy.[19] T.11/14/19: 133, 147-48. The Pride program would be four full days and one shortened day per week while J.O. attends five days per week at Meliora with the exception of one Friday a month, which is a shortened day.[20]  T.10/2/19: 93; T.12/2/19: 195-96. Because the student population tends to regress when they are not attending school, Meliora has a 223-day school year, significantly longer than the Board's typical school year. T.1/17/20: 27.

---

has five workstations.  B-46: 3; T.11/14/19: 129.  Anita Russell, administrator of pupil services for Glastonbury, gave yet a different answer, testifying that the Pride classroom contains seven or eight cubicles.  T.2/12/20: 152.

[18] Although Kelley testified that the Pride program had one classroom for the ten or eleven students with a connected resource room; T.10/2/19: 61, 65; the IEP states up to ten students, and Vanhaaften-Argens testified that there are two Pride classrooms and that her classroom, "Room 11," where J.O. would be, has eight of the ten students. T.11/14/19: 125-26, 149; B-46: 3.  Russell testified that the Pride program consisted of two classrooms with a therapy room in the middle.  T.2/12/20: 90.

[19] Glastonbury has placed students at Meliora under IEPs and has never raised a concern regarding the appropriateness of the programming at Meliora.  T.1/17/20: 28.

[20] As the IEP did not appear to document the shortened Wednesday schedule and appeared to assume a longer school day generally, it indicated that Glastonbury was proposing 33.75 school hours/week, rather than the 30.8 hours/week in the schedule Glastonbury actually proposed.  B-46: 2; B-58.

Although Kelley and Anita Russell, administrator of pupil services for Glastonbury, claimed that Meliora was not the least restrictive environment because it did not provide access to typical peers, the Board's proposed program did not provide for time with typical peers.[21]  T.10/2/19: 132, 153; T.2/12/20: 75, 102-03.  Moreover, Kelley confirmed that, at Meliora, J.O. has time with his peers and access to specials such as music and art, which Glastonbury was not offering.  T.10/2/19: 81-82, 129, 132, 154; T.12/2/19: 14; 115-17; T.1/17/20: 52, 147; B-46.

Also, of critical importance are J.O.'s feeding challenges and the differences in how they would be addressed at Meliora versus at the Pride program.  Meliora contracts with Sarah White, an SLP, who provides oral motor and feeding treatment.  T.1/17/20: 15. White has both trained staff in J.O.'s significant feeding, oral motor and medical needs, and she provides the direct oral motor therapy.  Id., 16.  Due to safety concerns, members of J.O.'s feeding team are on site at all times.  Id., 17-18.  At Meliora, the clinical decision of whether to switch to puree or liquids upon signs of fatigue is made by a team of highly trained, licensed professionals, including SLPs, OTs, and a nurse, as well as with the involvement of a BCBA with experience with oral motor and feeding.  T.1/22/20: 17; B-15;

---

[21] The HOD indicates that Caruso and Guilmette agree that J.O. is ready to be educated in a more traditional and less restrictive environment.  HOD: 8 ¶ 36.  As this implication is based on a mischaracterization of the evidence, it is clearly erroneous. Caruso testified that moving J.O. to a less restrictive environment could be possible if done incrementally, over a period of time, and, given his complex health profile, with highly trained staff to support his well-being and feeding; she did not testify that he was now ready to move to Pride. T.12/2/183. Furthermore, Guilmette testified that J.O. currently requires the level of services that Meliora provides.  T.1/17/20: 142.

B-16. By contrast, a paraprofessional would be implementing the feeding plan at Pride and have to make those clinical decisions.[22]  B-42; B-58.

There was also testimony concerning J.O.'s distractibility as related to other peer and the need for program flexibility to meet his needs. In the fall of 2018, Meliora attempted to place J.O. in a class with two peers, along with the support of a special education teacher, BCBA, and RBT. T.12/2/19: 88-90, 109; T.1/17/20: 48. According to his teacher, the mere addition of *two* peers caused his academic performance to decline and his level of distractibility to increase; moreover, there were concerns about his health. T. 12/2/19: 88, 109, 175-76. Guilmette testified that J.O. started to get regularly ill during that time. T.1/17/20: 48-49, 79, 135. Furthermore, J.O. would become lost if there was a conversation in another part of the room, and it was very difficult to get him back on task.[23] Id., 30, 128, 135. He had to be moved back to his individualized classroom. Id., 175, 182-

---

[22] Although the IEP recommendation states that a "district speech/language consultant will oversee J.O.'s feeding program and training of staff," neither the service grid nor the accommodation page outlines consultation with a feeding consultant or training. B-46: 2, 45, 48; T.10/2/19: 83-86. Moreover, Jennifer Hoskins, the SLP who testified on behalf of the Board and who would be the expert supporting the Glastonbury staff regarding feeding therapy, stated that she only works in Connecticut two days a week, during which time she sees 18 children. T.2/12/20: 29, 32, 38, 42, 48.  She admitted that she did not say the hours she would need to work with J.O. or specify a training program for staff during the PPT. Id., 65, 69. She was unaware that the Board was proposing a paraprofessional do the feedings, and she testified that it would not be appropriate for a paraprofessional to do the feedings for new foods. Id., 68. She also testified that Glastonbury had not given her a contract for any number of hours to consult in J.O.'s case. Id., 70. She had not worked with other children with Noonan syndrome. Id., 72. Although Kelley testified that Hoskins provided input into the Board's proposed feeding plan, when asked if she had any input into that proposed plan, Hoskins responded, "I did not do this feeding plan." T.2/12/20: 58; 10/2/19: 116; B-42. Hoskins testified that no transition or training plans for J.O.'s feeding program were discussed at the PPT meeting and that she had not spoken with any of J.O.'s doctors. T.2/12/20: 69, 72
[23] J.O. also becomes scared when he sees other children acting out. T.1/22/20: 26.

83. Similarly, when J.O. has been in physical therapy with two other students he has sometimes been unable to focus. [24]  T.1/22/20: 24.

J.O.'s struggles with attention and peer interactions were well-documented by Dr. Brandi Henson, a psychologist from Boston Children's Hospital, who conducted a psychological evaluation on J.O. in the fall of 2018, and noted his continuing challenges in the following areas: regulating his attention and behavior, impulsivity, cooperative play, and picking up on social cues, processing and recalling auditory information, visual-perceptual skills, and visual-motor skills. B-5: 9. Dr. Henson stated J.O.'s medical and associated neuropsychological profile placed him at risk for difficulties with functioning effectively in academic and social settings and developing appropriate adaptive skills required for daily life. Id.,5-6. She stated that J.O. "continues to require a program of educational supports through an IEP that combines placement in a substantially separate setting and direct services in speech, occupational therapy, and physical therapy," as well as feeding therapy and extended school year services. Id.,10.

Also, in the fall of 2018, the Board conducted its own evaluations of J.O. B-23. Kelley testified that these evaluations were in line with past evaluations and demonstrated that J.O. has significant needs. T.10/2/19: 54. Mrs. O. and Meliora had concerns regarding the Board's evaluations, and Meliora unsuccessfully tried to have the Board address these concerns at the January 30, 2019 PPT meeting. T.6/28/19: 71; T.12/2/19: 49. Kelley agreed that it would be concerning if the staff working with the student did not

---

[24] When J.O. has group physical therapy, there is a 3:3 student/PT ratio which ensures that ensuring each students goals and objectives are being addressed. T.1/22/20: 23. It further allows the Meliora team to adjust J.O.'s programming based on how he or others in the group are feeling. Id., 24. The Board was not offering this 3:3 staffing model. B-46.

believe that a student's evaluations reflected his actual daily abilities in the classroom. T.10/2/19: 44-45. Meliora indicated that, to the extent that skills were documented in a report that could not be duplicated, it would be concerning if J.O.'s programming was going to be informed by that evaluation. T.1/22/20: 37-38. Moreover, at points, the Board's evaluations contradicted each other. For example, while the Board's academic evaluator stated that J.O. could not hold a pencil and had no assistive technology to assist with writing, the Board's occupational therapy evaluator noted that he uses writing utensils to draw and write on paper and that he used an iPad to work on writing at Meliora. B-28 p.4-5; B-27: 4-6. The Board's speech and language evaluation documented J.O.'s progress, but also his continued challenges with speech and reflected the need for an intensive language program. B-40.

Caruso testified that, after seeing the January 30, 2019 IEP, she was surprised at the Board's changes to J.O.'s goals and objectives in the document. T. 12/2/19: 52. She had not previously seen a district omit Meliora's proposed programming recommendations without discussion. Id.,166. Caruso testified that in some areas, the Board kept Meliora's goals and objectives, but, in other areas, the Board either attempted to group things together or stopped addressing some areas of need. Id., 52-59, 65; B-23; B-46; see also T.1/17/20: 14; T.1/22/20: 45. For example, the Board grouped objectives together, such as working on responding to demands from adults and peers. B-46: 17. By contrast, Meliora separated these objectives given that J.O. responds differently to adults than peers. T.12/2/19: 59-60. The IEP also omitted an objective for reciprocal play in PT, which Meliora thought was important for him. T.1/22/20: 45, 111. For J.O., having specific objectives is essential because, based on his behavior, one may assume that he

knows more than he does when, in fact, he actually is missing foundational pieces that require explicit instruction. Id. Guilmette stated that Meliora had concerns that "steps were missing" in the Board's proposed programming. T.1/17/20: 58. In other areas, the Board simply removed objectives or simplified objectives; for example, Meliora was working on increasing his independence and identifying problems across all environments, while the Board would measure independence only in one workspace. T.12/2/19: 63; B-46: 17; B-23: 14. Meliora staff testified that J.O. requires objectives across different environments to work on his cognitive flexibility and rigidity. T.12/2/19: 63. Additionally, certain important objectives were removed, reduced or made less specific or less measurable. B-23; B-46. Caruso testified Meliora brought up concerns during the PPT meeting regarding the goals and objectives and that they expressed that they were concerned that, in some areas, the Board was setting the bar too low. T.12/2/19: 75. Caruso stated that she would not recommend removing goals in the middle of a school year without data to support such a change. Id., 76. The IEP also omitted the accommodation of charting progress and maintaining data; in its post-hearing brief, p.36 n.3, the Board attempted to argue that that accommodation was implied.

Meliora progress reports from the spring of 2019 indicate continued progress in all areas. B-49; B-50; T.6/28/19: 80-82. When J.O. started at Meliora he had limited language and struggled with even the rhyming of sounds; now he can read words. T.12/2/19: 22. From a feeding perspective, he entered Meliora as a student on a G-Tube who would gag and choke when eating; now he has decreased from two G-Tube feedings to one, and gagging has diminished significantly. Id., 22, 82. Mrs. O testified that, due to his program at Meliora, J.O. is like a whole new child. T. 6/28/19: 82. Within Meliora's

structure, J.O.'s behaviors of wandering, pushing people, grabbing materials, dropping, scripting, finger-sucking, whining, mouthing items, and noncompliance have decreased dramatically. T.12/2/19: 24-26. Caruso testified that these behaviors spike if he is working with non-familiar staff and noted relationships with staff are very important to J.O. Id., 26, 28. J.O. loves his teachers at Meliora and loves attending school there. T. 6/28/19: 83. He has built a trusting relationship with the staff, and he is happy to be at school. Id. J.O. has true friends at Meliora and is accessing his education in a meaningful way. B-37 p.6; T.12/2/19: 121-22. Meliora is meeting all his needs and is the appropriate placement for J.O. T.1/17/20: 63-4; T.12/2/19: 79-80.

## II.   LEGAL ARGUMENT

### A.  Standard of Review and Applicable Law

Parties aggrieved by the findings of a Hearing Officer in an IDEA administrative hearing are entitled to bring a civil action in federal court pursuant to 20 U.S.C. § 1415(i)(2)(A). See M.H. v. New York City Dep't of Educ., 685 F.3d 217 (2d Cir. 2012). "[T]he procedure is in substance an appeal from an administrative determination, not a summary judgment [motion].  . . . [B]asing its decision on the preponderance of the evidence, [the court is required to] grant such relief as the court determines is appropriate." § 1415(i)(2)(C)(iii). "The motion serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in [the] IDEA [in developing the specific IEP at issue] and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits." M.H. v. New York City Dep't of Educ., 685 F.3d at 225-26. (quoting Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005).

The Court must conduct "a more critical appraisal of the agency determination than clear-error review . . . ." M.H v. New York City Dep't. of Educ., 685 F.3d at 244.  The Court gives due weight to the administrative proceedings, giving particular deference where the Hearing Officer's review has been thorough and careful. T.K v. New York City Dep't of Educ., 810 F.3d 869, 875 (2d Cir. 2016). Determinations that are not "grounded in thorough and logical reasoning" should be provided less deference. M.H. v. New York City Dep't. of Educ., 685 F.3d at 244. Reviewing courts do not defer to a Hearing Officer's conclusions of law, as Hearing Officers do not have greater expertise than the Courts on legal matters. Id. The legal conclusions of the Hearing Officer are subject to *de novo* review. See Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ., 397 F.3d at 83.  A finding of fact is clearly erroneous when evidence in the record supports the finding but where the reviewing court nevertheless is left with the definite and firm conviction that a mistake has been committed. N.B. v. Hellgate Elementary Sch. Dist., ex rel. Bd. of Directors, Missoula Cty., Mont., 541 F.3d 1202, 1207 (9th Cir. 2008).

The purpose of the IDEA is to ensure that all children with disabilities have available to them a free, appropriate, public education (FAPE) that emphasizes "special education and related services designed to meet their unique needs and prepare them for further education, employment and independent living," as well as to ensure that the rights of the children with disabilities and parents of such children are protected ... " 20 U.S.C. 1400 (d) (1) (A) and (B); 34 C.F.R. § 300.17; see also Reyes ex rel. R.P. v. New York City Dep't of Educ., 760 F.3d 211, 214 (2d Cir. 2014) ("A FAPE consists of special education and related services tailored to meet the unique needs of a particular child . . ." [Internal quotation marks omitted.]). The IEP must enable a child

to derive "meaningful" educational benefit. <u>Board of Educ. v. Rowley</u>, 458 U.S.176,192 2017 (1982). A Board must offer an IEP that is reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances, and "[t]he instruction offered must be '*specially* designed' to meet a child's 'unique needs' through an [i]ndividualized education program [IEP]." <u>Endrew F. ex rel. Joseph F. v. Douglas County School Dist. RE-1</u>, 137 S. Ct. 988, 999 (2017) (emphasis in original); 20 U.S.C. §1401(29), (14).

The standard for determining whether a Board has provided FAPE is set forth in a two-part inquiry: first, whether the Board complied with the procedural requirements of the IDEA, and, second, whether the IEP is "reasonably calculated to enable the child to receive educational benefits." <u>Rowley</u>, 458 U.S. at 206-07. The Board has the burden of proving the appropriateness of the program and placement they have offered by a preponderance of the evidence, and the Parent has the burden of prove the appropriateness the private placement being sought by a preponderance of the evidence. R.S.A. §10-76h-14(a) (c); <u>see also</u> <u>Walczak v. Florida Free Union Sch. Dist.</u>, 142 F.3d 119, 122 (2d Cir. 1998).

### B. The Procedural Violations Resulted in a Denial of FAPE, Impeded the Parents' Ability to Participate in the Decision-Making Process, and Caused a Deprivation of Educational Benefit.

FAPE is denied when the procedural violation impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or caused a deprivation of educational benefits. 20 U.S.C., § 1415(f)(3)(E)(ii); 34 C.F.R. § 300.513 (a) (2). Compliance with the IDEA's procedural requirements is the responsibility of the Board

and not the parents. Unified Sch. Dist. No. 1 v. Dep't of Educ., 64 Conn. App. 273, 285 (2001). Cumulative procedural violations can deprive a student of FAPE. See L.O. v. New York City Dep't. of Educ., 822 F.3d 95, 109 (2d Cir. 2016).

The IDEA requires that a student's goals and objectives should meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum. 34 C.F.R. § 300.320(a)(2)(i)(A).Both achievements in "educational and personal skills identified as special needs" must be considered. Town of Burlington v. Dep't of Educ. For Com. of Mass., 736 F.2d 773, 788 (1st Cir. 1984). Services to be provided under special education must target all areas of need whether they be academic, physical, social or emotional. Mr. I. ex rel. L.I. v. Maine Sch. Admin. Dist. No. 55, 480 F.3d 1, 12 (1st Cir. 2007). Both Caruso and Bergenty testified that parts of their programming in areas of need were removed in the January 30, 2019 IEP, including objectives in the area of math, developmental skills, emotions, physical therapy, social reciprocity and relatedness, without data or reason to do so. 12/2/19: 60-65, 166-167, T.1/22/20: 111, B-46; B-23. This procedural error that significantly impacts J.O.'s access to his education and denies him a FAPE.

Next, merely allowing the parents to be present at PPT meetings did not amount to meaningful participation. The IEP is to be a collaborative process developed by the parents of the student, educators and other specialists. Honig v. Doe, 484 U.S. 305, 311 (1988). The Parents went to two PPTs, toured the proposed program, provided multiple letters from J.O.'s doctors, and consented to having the school team speak with the doctor who coordinates J.O.'s medical care; nevertheless, the Board dismissed the parents' concerns out-of-hand because they requested continued placement at Meliora, the only

program where their son has made progress to date. When the parents asked questions at the PPT regarding the specifics of J.O.'s day in the Board's proposed program, the response from the Board struggled to answer. <u>See</u> T.10/2/19: 69. The parents were never allowed to be true members of the PPT team, and this violation denied meaningful parental participation.

Further, the Board committed a procedural violation by failing to discuss information provided by the Parents at the PPT meeting, specifically the letters from J.O.'s doctors, or to consider alternative placements. <u>See</u> <u>MK v. East Haddam BOE</u>, (SDE 19-0146). While three letters from J.O.'s doctors were provided to the Board prior to the January 2019 PPT, the Board admitted to only even reading one of them. T.10/2/19: 59; 78. Kelley acknowledged none of the letters provided to the Board endorsed J.O.'s placement in a classroom of up to ten students.  <u>Id.</u>, 77. Megson testified that only one letter was reviewed at the PPT and she noted she did not recall even receiving the letters. T.1/22/20: 196. While it is always imperative that a team consider the recommendations of outside professionals, in a case such as this where those recommendations explain the requirements of a program that would keep J.O. safe and available for learning, consideration was vital. All three letters recommended J.O.'s continued placement at Meliora in light of his complex medical needs. The district's failure even to consider this information precluded the parents from effectively advocating for their son and being true members of the PPT.

Predetermination of placement by a Board prevents Parents from having a meaningful opportunity to participate and amounts to a denial of FAPE. <u>See</u> <u>Deal v. Hamilton County Bd. of Educ.</u>, 392 F.3d 840, 857-58 (6th Cir. 2004) (where district pre-

decided not to offer requested services, it amounted to procedural violation of IDEA that deprived parents of meaningful participation in process, despite fact that parents were present and spoke at IEP meeting, as participation must be *meaningful*). Megson, the head nurse for Glastonbury Public Schools, inputted a note on August 31, 2018, stating "student currently outplaced. Meeting with team to create IEP and plan to return to GPS school." B-52; T.1/22/20: 183-84. Megson's note confirms that it was the Board's plan in August 2018 to bring J.O. back to district, a plan which would have been made before talking with his doctor, evaluating J.O., reviewing his records, observing him at Meliora, talking with his current Meliora team, or even meeting him. Further, Hoskins testified that the Board reached out to her in September 2018, and it was her understanding that the Board planned to bring J.O. back to the district; she believed that that was the reason that she was invited to the January 2019 PPT. T.2/12/20: 56-57. This obvious predetermination clearly impeded the parents' right to meaningful participation in their son's PPT because no matter what the parents said or did, the Board had already determined that it was bringing J.O. back to Glastonbury. B-52.

Furthermore, an IEP fails to confer educational benefit where there are "no procedures in place... to ensure that data was being collected, that timely evaluations were taking place or to ensure that staff was accountable for documenting progress and monitoring instructional strategies ..." <u>Newtown Pub. Sch.</u>, 107 LRP 59412 (CT SEA 2007). While the Meliora team collects data all day, every day, the Board's IEP did not reflect any plan or procedure to collect data within the Pride program. In fact, per the IEP, the Board proposed a program that was both less measurable and no longer reliant on data at all in some areas. For example, Meliora was measuring the PT goals based on

data, while Glastonbury changed the progress monitoring to be based on observations. B-23: 29; B-46: 35. For J.O., measuring his skills and knowledge based on observation could be deceiving because he has learned to script and memorize, and Bergenty testified that, if you observe J.O. in an activity, he may look "typical" on the surface but that there are a lot of skills he does not have. T.1/22/20: 16. The Board's approach likely would result in a lack of understanding of his true skill level and his needs and would fail to note and address all areas of true deficits, leading to regression of skills.

The inaccuracy in the service hours set forth in the IEP, the contract which the Board is supposed to implement, constitutes yet another procedural violation that violated J.O.'s right to FAPE as the IEP cannot be implemented as written. Per the IEP, Glastonbury was proposing 33.75 hours a week of special education and related services, but, per the schedule that Glastonbury created for J.O., he would be receiving 30.8 hours a week of special education and related services. B-46 p. 48; T.11/14/19: 147; B-58: 1; T.10/2/19: 93-94. Moreover, when information provided to the parents in the IEP is not accurate, they are denied true participation in the programming for their child, resulting in a violation of FAPE.

### C. The Board's Program Did Not Offer FAPE, and the Board's Program Is Not the Least Restrictive Environment for J.O.

Under the second part of the inquiry, the Board failed to create an educational program that was reasonably calculated to enable J.O. to receive educational benefits in light of his circumstances; nor was it reasonably calculated to enable J.O. to receive educational benefit. See Rowley, 458 U.S. at 202; Endrew. F., 137 S. Ct. at 999. The "basic floor of opportunity provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the

handicapped child." Rowley, 458 U.S. at 202. FAPE is provided when an IEP is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew F., 137 S. Ct. at 999. The Supreme Court clarified that the standard is *markedly* more than de minimis. Id., 1000. The adequacy of the IEP turns on the unique circumstances of the child for whom it was created. Id.,1001. An IEP must provide significant learning and meaningful benefit. Polk v. Central Susquehanna Intermediate Unit I6, 853 F.2d 171, 182, 184 (3d Cir. 1988). FAPE exists when an IEP provides personalized instruction with sufficient support given to permit the student to benefit from that instruction. Walczak, 142 F.3d at 130.

In light of his complex and significant needs, for J.O. even to receive the basic floor of opportunity, he requires, not only highly intensive individualized services in every area including academics, social skills, speech and language, behavior, attention, fine motor, gross motor, oral motor and feeding, but he needs strict protection from exposure to germs so as to avoid putting his life at risk. By virtue of J.O.'s genetic diagnosis, his immune function is compromised, and he is extremely vulnerable to respiratory illnesses. P-45: 1. He has a propensity for his lungs to flood when he gets sick, and his lymphatic system is not fully developed, so he is unable to mount an appropriate response to illness. T.11/14/19: 31. Due to J.O.'s medical fragility and compromised immune system, exposure to any illness will not only lead to missed time in school, but also could lead to a prolonged hospital stay or worse, making it impossible for J.O. to be educated. J.O. has had to fight for his life several times. The Board's characterization of the Parents' position as a mere preference for Meliora is unfounded, ignores the severity of J.O.'s medical situation, and serves only to distract from the inappropriate nature of the Board's program.

When he has been in a program other than the individualized program at Meliora, his absences have been significant. Given J.O.'s extreme distractibility, even in a room with two other students, and his medical fragility, placing J.O. in a classroom with up to ten students would be putting him at risk for educational harm but also could have a potentially catastrophic impact on his health. B-27: 1. Accordingly, all three of J.O.'s doctors who submitted letters recommended that J.O. remain at Meliora. A Board cannot disregard a "clear consensus" of evaluative material showing that a child needs a particular service, methodology or placement to receive FAPE; A.M v. NY Dep't of Educ., 845, F.3d 623 (2d Cir. 2017); nor can a Board simply ignore the information from a Student's treating clinician in determining what program and placement a Student requires. Fairfield Board of Educ., l 09 LRP 53093 (May 11, 2007).

The Board's proposal also lacked specifics about how it would implement a feeding plan for J.O., who is G-tube dependent. Although the IEP recommendation states that a "district speech/language consultant will oversee J.O.'s feeding program and training of staff," neither the service grid nor the accommodation page indicates consultation with a feeding consultant for oversight and training. B-46: 2, 45, 48; T.10/2/19: 83-86. Similar confusion surrounds how the Board would handle J.O.'s complex health needs. Russell testified that, were J.O. to come to Pride, Glastonbury would make its own healthcare plan by collaborating with his treating physicians, but she acknowledged that the January 2019 IEP did not note that Glastonbury would implement its own healthcare plan.[25]

---

[25] Even if it were proper to consider what the district *might have* done to program properly for J.O., however, the Board's explanation is belied by the record. Although Megson testified that a healthcare plan would have been discussed at a parent meeting, the agenda of the parent meeting that was proposed for March, months after the PPT, does not include discussion of a healthcare plan.  B-48 p. 7; T.1/22/20: 158.

T.2/12/20: 143-45. The meeting summary indicates that Kelley said that Glastonbury would implement the same health protocols as Meliora, even though J.O. has his own classroom at Meliora and Meliora's healthcare plan was designed for that setting, which is entirely different from the Pride program. B-46: 3; T.2/12/20: 142. Additionally, during the hearing, the Board claimed it would hire an LPN for J.O., but the district did not propose an LPN as part of J.O.'s program at the PPT meeting; nor was a nurse included in the January 2019 IEP. T.1/22/20: 160-61; T.10/2/19: 113; T.2/12/20: 133; B-46. Glastonbury staff further struggled to describe what J.O.'s day would look like. T.10/2/19: 69, 73. Finally, the Board tried to insinuate throughout the hearing that J.O. would have access to typical peers if placed in the Pride program; however, Kelley testified that J.O. would spend his day in the Pride classroom or resource room, and the IEP does not include any time with typical peers; the hearing officer's finding to the contrary is clearly erroneous. B-46; T.10/2/19: 64; B-58; HOD: 12, ¶ 58. Although Glastonbury staff tried to fill in some of the holes of the IEP in their hearing testimony, a deficient IEP may not be effectively rehabilitated or amended after the fact through testimony regarding services that do not appear in the IEP. R.E. v. N.Y.C. Dept. of Educ., 694 F.3d 167 (2d Cir. 2012). Rather, parents must be able to judge the IEP when it was written and any speculation about what might have happened in the future is prohibited. Id. Additional testimony may not be used to materially alter a deficiently written IEP by establishing that the student would have received services beyond those listed in the IEP but only to justify what was in the IEP.[26] Id.

---

[26] This preclusion does not apply to evidence of progress in the private school. R.E. v. N.Y.C. Dept. of Educ., supra, 694 F.3d 167.

Rather than designing a program taking into account J.O.'s unique needs, the Board sought to fit him into an existing program, largely for students on the autism spectrum. The Pride program classroom consists of up to ten children in grades K-5, including students with behavioral needs, in an elementary school of over 500 students, which is served by one building nurse. T.10/2/19: 59-61, 78, 168; T.11/14/19: 131; T.1/22/20: 129-130. In Glastonbury's program, a sick child would be able to sit at the same table as J.O. T.11/14/19: 149-51; T.1/22/20: 39. The head nurse indicated that she did not even believe J.O. to be immunocompromised despite all the evidence to the contrary. T.1/22/20: 133-34. J.O. would be exposed to distractions and illnesses from the Pride classroom with students and staff coming in and out of the room all day. Caruso testified that after hearing the program the Board proposed for J.O., she had concerns that the Board did not have an accurate understanding of his complexities. T.12/2/19: 49-50. She noted it would be very difficult for him to learn in the type of environment being proposed by the Board. Id., 50-51. By disregarding the clear consensus of the educational and medical professionals working with J.O., the Board denied him a FAPE.

Moreover, special education students are to be educated in the least restrictive environment that is appropriate and consonant with his or her needs so as to protect students with special needs from being inappropriately segregated. T.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 161 (2d Cir. 2014).

> We ask first, whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child, and if not, then whether the school has mainstreamed the child to the maximum extent appropriate. Factors relevant to the first question include: (1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom; (2) the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in a special education class; and (3) the possible negative side effects of

> the inclusion of the child on the education of other students.  . . .We have
> emphasized that the LRE requirement is not absolute. It does not require a school
> district to place a student in the single least restrictive environment in which he is
> capable of any satisfactory learning.  . . . Although the IDEA strongly prefers
> placing children in their least restrictive environment, the presumption in favor of
> mainstreaming must be weighed against the importance of providing an
> appropriate education to handicapped students.  . . .

(Citations omitted; internal quotation marks omitted.). Id., 161–62. At Pride, J.O. would

spend his day in a cubby in the Pride classroom or in its resource room, whereas at

Meliora, because of the significant measures taken to ensure that J.O. is safe and only

exposed to healthy peers, J.O. is able to have time with his peers as well as access to

specials such as music and art, which the Board was not offering. T.10/2/19: 81-82, 129,

132, 154; T.12/2/19: 14; 115-17; T.1/17/20: 52, 147; B-46. Dr. Schwartz stated that being

paired with like peers as he is at Meliora is beneficial for J.O. B-61; see also T.12/2/19:

73-74. The least restrictive placement *appropriate for J.O.* needs to take into

consideration his medical fragility and compromised immune system, which Pride would

fail to do. It would be most restrictive to place J.O. in an environment that is highly likely

to result in illness for him, hospitalization, possible intubation, and, given his severely

compromised immune system, death. In light of all of the information demonstrating that

J.O. requires a highly structured and distraction-free learning environment, the Board

proposed a placement is not the least restrictive environment appropriate for J.O.

### D. The Hearing Officer's Decision in the Present Case Is Not Entitled to Deference.

Because the hearing officer's review was neither thorough nor careful, because

her determinations were not grounded in thorough and logical reasoning, and because

she failed to consider the evidence in this matter independently, her decision (HOD)

should not be given deference.[27] See T.K v. New York City Dep't of Educ., 810 F.3d 869 (2d Cir. 2016); M.H. v. New York City Dep't. of Educ., 685 F.3d 217 (2d Cir. 2012).

First, the hearing officer's findings that the Board properly reviewed and considered the recommendations of J.O.'s medical doctors were wholly unsupported by the record and clearly erroneous. HOD: 12 ¶ 59, 13 ¶ 61, 16 ¶ 11, 16 ¶ 12.  Even the Board's witness, Kelley, testified that the Board "did not read all three letters, no," and that "[o]ne letter was considered at the – was reviewed and considered." T.10/2/19: 21, 59, 77-78. In their letter to amend the PPT minutes, the Parents pointed out that the letters were never discussed during the PPT and that the Board's attorney merely confirmed receipt of them at the end of the meeting and stated that they would be added to J.O.'s file. B-48: 3. These letters were vitally important in establishing the *necessity* of J.O. remaining in his current program. Dr. Townsend's letter praised the gains that J.O. had made and urged keeping J.O. in his current placement, noting the level of services and support necessary given the Noonan Syndrome that underlies his feeding difficulties. B-35. Dr. Roberts' letter reiterated her previously expressed concerns about "the ill-advised suggestion that he move to a new school." B-39. She added that J.O.'s successes "are not evidence that the job is done but, rather, that the individualized program at Meliora is what he has needed and continues to need." Id. She stated that J.O. is medically fragile and recommended that J.O. remain at Meliora in his current placement with the current level of support, noting that, "to disrupt this program would be highly inappropriate." Id.

---

[27] Although at first blush, the HOD might appear comprehensive due to its length, a closer inspection of the decision reveals that over half of it is devoted to merely copying J.O.'s IEP, see, e.g., HOD: 8-11, 23-32, or regurgitating findings from various evaluations that have no relevance whatsoever to the claims at issue. Id., 5-8.

Dr. Onyirimba's letter stated that J.O. "remains medically fragile and does not cope well with transitions." B-45. She added that changing his placement at that point in the school year would be "ethically unacceptable," that possible placement revision was, "at best, ill-advised and [did] not take into account his overall well-being;" she recommended that he remain at Meliora as that was the appropriate placement. Id. It was improper for the Board not even to look at, let alone consider, the opinions of the medical professionals treating a medically fragile, immunocompromised student. Mr. P. v. West Hartford Bd. of Educ., 885 F.3d 735, 753 (2d Cir. 2018).  For the hearing officer to assert, contrary to even the Board's own evidence, that the Board reviewed all three letters and then summarily to dismiss the recommendations contained therein, renders her decision unsupportable. See Z.J. v. Bd. of Educ. of City of Chicago, Distr. No. 299, 344 F. Supp. 3d 988, 1003-04 (N.D. Ill. 2018) (rejecting argument that plaintiffs merely submitted expert reports containing recommendations with no other evidence supporting those recommendations in concluding that plaintiffs demonstrated by preponderance of the evidence that student would benefit educationally by receiving vision therapy).

Second, in dismissing the opinions of the medical professionals, the hearing officer applied an arbitrary and capricious standard. K.S. ex rel. P.S. v. Fremont Unified Sch. Dist., 545 F. Supp. 2d 995, 1003 (N.D. Cal. 2008) (district court is not required to accept any findings by the ALJ which are arbitrary and capricious or an abuse of discretion). The hearing officer in the present case criticized the doctors for not including whether they had knowledge of the IEP or "a fact based objection," and for not phrasing their opinion so as to state that J.O. "requires a private classroom" or "is too immune deficient to attend

public school." HOD: 12 ¶ 59, 13 ¶ 60.[28] No such talismanic language is required, however; nor could the doctors have predicted that that particular language should have been included, given their clear recommendations to keep J.O. at Meliora. Indeed, Dr. Roberts even cited J.O.'s medical fragility, stated that he should remain at Meliora with his current level of support, and characterized a disruption as "highly inappropriate." B-39.  Dr. Onyirimba too cited J.O.'s medical fragility, noting that changing his placement was ethically unacceptable, at best ill-advised, and failed to account for J.O.'s overall well-being. B-45. In rejecting the opinions of J.O.'s doctors, the hearing officer effectively credited the Board's nurse's position that J.O. is not even immunocompromised. See <u>K.S. ex rel. P.S. v. Fremont Unified Sch. Dist.</u>, 545 F. Supp. 2d 1004 (finding witnesses more credible simply because they agree with district's position constitutes serious error in reasoning).

### E.  Meliora Is the Appropriate Placement for J.O.

---

[28] The hearing officer also submits that the doctors previously had recommended larger class sizes for J.O., ignoring the evidence that they had to revise their recommendations after J.O.'s health was adversely affected. HOD: 3 ¶ 60, 16 ¶ 12. T.11/14/19: 40, 72-73. As noted previously, the hearing officer also improperly suggests that Dr. Onyirimba believed that Glastonbury was proposing to have J.O. be in a mainstream classroom. Hearing Officer Decision [HOD]: 12 ¶ 59. On the contrary, Dr. Onyirimba testified that she believed that the hearing concerned some conflict or concern about J.O.'s "placement at Meliora versus trying to mainstream him in Glastonbury schools." T.11/14/19: 41-42. As the hearing officer herself recognized, however, the Pride program is housed at Nayaug Elementary which "serves a population of about 500 mainstream students," and she noted that most of the students in Room 11 spend as much as 80% of their time in the mainstream environment of Nayaug. HOD: 11, 12. Moreover, Dr. Onyirimba testified that she would not recommend that J.O. be in a class of ten students, that, in her medical opinion, he could not be in a class with up to ten students, and that none of J.O.'s medical team thought that he could be in a public school program and in a classroom of up to ten students. T.11/14/19: 33-34, 99. Furthermore, Dr. Onyirimba explained that her concerns about such a classroom stemmed both from the increased risk of infection and because of J.O.'s distractibility. T.11/14/19: 105-06; see also T.12/2/19: 23.

A private school placement is not held to the same FAPE standard as a public school. Florence County v. Carter, 510 U.S. 7, 15-16 (1993). The determining factor is not whether the private placement is perfect but that it is appropriate. Warren G. v. Cumberland County Sch. Dist., 190 F. 3d 80, 84 (3d Cir. 1999). The private placement need only confer some educational benefit to the student. C.B. v. Special Sch. Dist. No. 1, 636 F.3d 981, 989 (8th Cir. 2011); Warren G., 190 F.3d at 85. The Parents "need only demonstrate that the placement provides 'educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.'" Frank G. v. Board of Educ. of Hyde Park, 459 F.3d 356, (2d Cir. 2006), citing Rowley, 458 U.S. at 188-89. Private schools are not held to the same mainstreaming requirements as a public school. M.S. v. B.O.E., City of Yonkers, 231 F.3d 96, 105 (2d Cir. 2000), (citing Warren G., 190 F.3d at 84). A Hearing Officer is entitled to order a school district to reimburse parents for private school placement if it determined the placement, rather than the proposed IEP, is appropriate under IDEA. School Comm. of Burlington v. Dep't of Educ. of Mass., 471 U.S. 359, 369 (1985).

As a preliminary matter, the Board did not necessarily challenge the appropriateness of Meliora under the FAPE standard. Indeed, placement at Meliora provides J.O. with educational instruction specially designed to meet his unique needs, supported by the necessary services to permit him to benefit from instruction. The Board already recognized that Meliora is an appropriate program by placing J.O. there previously, and it has conceded that J.O. is making progress there. T.2/12/20: 71; T.10/2/19: 39, 76; B-23. In sharp contrast to the Board's proposed program as detailed,

supra, sick children would be separated from J.O. as students are assessed before they can enter a group with J.O.  T.1/17/20: 31, 39. Meliora clears hallways for J.O. when he is transitioning and cleans spaces throughout the day, whereas, in Glastonbury, such cleanings appear to be reserved for when a student is vomiting. T.1/17/20: 32; T.1/22/20: 173. Given Meliora's small environment, staff can adjust J.O.'s schedule or places of instruction depending on how he and peers are feeling. T.1/17/20: 33. Meliora recognizes that J.O.'s medical and educational needs cannot be separated. Id., 39. Indeed, Meliora understands that if J.O. falls ill, he would at best miss an extensive amount of school, and at worst, be unable to survive, either of which obviously would impact his education.

It also bears noting that Meliora provides J.O. with a highly trained team of professionals including a feeding team consisting of an SLP, OT, BCBA, and nurse, which is especially important given J.O.'s history of choking and gagging, and the team is making great progress with J.O. Id., 2; B-16: 2; T.12/2/19: 18, 22, 82. Moreover, having his own classroom at Meliora both protects J.O.'s health and helps with his focus. Meliora also provides opportunities for J.O. to have positive peer interactions while still protecting his health. T.6/28/19: 61; T.12/2/19: 29, 82-3; T.1/17/20: 52, 53, 60, 52; B-61. Given J.O.'s complex needs, particularly, his health, feeding and distractibility challenges, his classroom at Meliora provides the appropriate setting to enable him to be educated and make progress, as the Board has acknowledged by placing J.O. at Meliora previously.

## III.   CONCLUSION

For the foregoing reasons, the Parents respectfully request that the Court reverse the Final Decision and Order of the Hearing Officer and further award attorney's fees and any other relief the court deems appropriate.

PLAINTIFFS,

By: /s/ Julia K. Conlin, Esq.
Julia K. Conlin, Esq.
Emily Graner Sexton, Esq.
Sexton & Company, LLC
331 Main Street, 3rd Floor
Hartford, CT 06106
Email: jconlin@sextoncolaw.com
Phone: (860) 325-0073
Fax.: (860) 838-6801
Fed. Bar No.: 22786

Courtney P. Spencer, Esq.
The Law Office of Courtney P. Spencer,
LLC
100 Riverview Center, Suite 120
Middletown, CT 06457
Email:
courtney@courtneyspencerlaw.com
Phone: (860) 430-5380
Fax.: (860) 430-5382

## **CERTIFICATE OF SERVICE**

This is to certify that, on September 30, 2020, a copy of the foregoing Memorandum in Support of Plaintiff's Motion for Judgment on the Administrative Record was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By: /s/Julia K. Conlin