**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

MR. and MRS. O, *on their own behalf*
*and as next friends of* J.O.
      *Plaintiffs*,

     v.

GLASTONBURY BOARD OF
EDUCATION,
      *Defendant*.

No. 3:20-cv-00690 (VAB)

**RULING AND ORDER ON CROSS-MOTIONS FOR**
**JUDGMENT ON THE ADMINISTRATIVE RECORD**

On May 18, 2020, Mr. and Mrs. O. ("Plaintiffs" or "Parents") filed a lawsuit against the

Board of Education of Glastonbury, Connecticut ("Glastonbury" or "the Board"), alleging that

Glastonbury violated the right of their son ("Student" or "J.O.") to a free appropriate public

education ("FAPE") under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et*

*seq.* ("IDEA") and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) ("Section 504").[1]

*See* Compl. ECF No. 1 (May 18, 2020) ("Compl.").

This action is an administrative appeal of a due process hearing officer's decision, dated

April 17, 2020, in *Student and Glastonbury Board of Education*, Case No. 19-0463 ("Final

Decision and Order"), which found, *inter alia*, that Glastonbury provided the Student with a

FAPE in the 2018-2019 school year (from the date of the Planning and Placement Team ("PPT")

meeting on or about January 30, 2019 to the end of the school year). *See* Final Decision and

---

[1] In their original hearing request, Plaintiffs alleged that Glastonbury violated the rights of their son under Section
10–76 of the Connecticut Statutes, in addition to his rights under the IDEA and Section 504. *See* Request for Due
Process Hr'g at 9, ECF No. 26 (Apr. 10, 2019). This cause of action was not brought in the Complaint.

Order, ECF No. 26-32 (Apr. 17, 2020) ("Final Decision").

Both Plaintiffs and the Board have moved for judgment on the administrative record.

For the following reasons, both parties' motions are **DENIED**, and this case is remanded to the state administrative hearing officer for additional findings consistent with this Ruling and Order.

## I.    BACKGROUND

### A.  Administrative Complaint

On April 10, 2019, Plaintiffs filed a Request for Impartial Special Education Hearing for Glastonbury's alleged denial of a FAPE for the Student and requested a "remedy of placement at Meliora Academy." Final Decision at 13 ¶ 64. Plaintiffs alleged, *inter alia*, that, in the 2018-2019 school year:

- Glastonbury denied the Student an appropriate Individualized Education Plan ("IEP"). *See* Request for Due Process Hr'g at 1–9, ECF No. 26 (Apr. 10, 2019) ("Req".).

- Glastonbury failed to provide an appropriate program or educational placement for the Student. *Id.*

- Glastonbury failed to provide an opportunity for parent participation in the development of the IEP. *Id.*

- Glastonbury predetermined the Student's educational program. *Id.*

Through the due process hearing, Plaintiffs sought placement of the Student at Meliora Academy for the 2018-2019 school year. *Id.* at 9.

### B.  The Hearing Officer's Decision

On May 10, 2019, Hearing Officer Ann F. Bird ("Hearing Officer Bird") held a pre-hearing conference. Final Decision at 1. After an extension of the hearing date by the parties,

2

Hearing Officer Bird identified four issues to resolve:

1. Did the Board offer the Student a FAPE from the date of the PPT meeting on or about January 30, 2019 for the remainder of the 2018-2019 school year?

2. If not, is Meliora Academy appropriate for the Student?

3. If so, should the Board be ordered to place the Student at Meliora Academy for the remainder of the 2018-2019 school year?

4. Should the Student's program for the 2019-2020 school year be addressed in this decision?

*Id.* Throughout the underlying administrative hearings, Plaintiffs were represented by counsel. *Id*.

Hearing Officer Bird presided over seven hearing dates, on June 28, 2019; October 2, 2019; November 14, 2019; December 2, 2019; January 17, 2020; January 21, 2020; and February 12, 2020. *Id.* at 2.

On April 17, 2020, Hearing Officer Bird issued her Final Decision and Order ("Final Decision"). *Id.* at 1–21. She made seventy-three findings of fact and thirty-six conclusions of law. *Id.*

The Student, who was eight years of age at the time of the administrative hearing, was diagnosed with Noonan Syndrome as an infant. *Id.* at 3 ¶ 3. "Noonan Syndrome is a genetic disorder characterized by short stature, heart defects, skeletal malfunction, development delays, and other problems." *Id.* Before his first birthday, the Student underwent emergency surgery to repair heart defects—notably a heart murmur and two other defects. *Id.* at 3 ¶¶ 3–4. He also has had other surgeries to correct physical malformations. *Id.*

At the time of the hearing, the Student had medical diagnoses of Noonan Syndrome,

global developmental delay, cardiomyopathy, gastroesophageal reflux, slow emptying of his bowels and lordosis, oral motor dysfunction, and a feeding disorder, which requires the Student to use a G-Tube to meet his daily caloric needs. *Id.* at 3 ¶ 5.

The Student, who was initially enrolled in the Coventry School District, received "Birth To Three" services due to his delays in motor and language development through the Coventry Board of Education. *Id.* at 3–4 ¶ 6. In that program, he received "speech therapy, occupational therapy, [ ] physical therapy, . . . [and] specialized instruction." *Id.*

The Student, through parental choice, then attended a Pre-Kindergarten classroom of about twenty-five (25) students at the breakthrough Magnet School in Hartford from August 2014 until December 2015. *Id.* at 4 ¶ 7. As a result of respiratory infections that led to extended absences, the Student was placed on homebound tutoring for the 2015-2016 school year, and the Student was educated at home. *Id.*

Under a settlement agreement with the Parents, the Coventry Board of Education placed the Student at Meliora Academy for the 2016-2017 school year. *Id.* at 4 ¶ 8. In the summer of 2017, the Student's family moved from Coventry to Ellington, where, initially, the Board of Education continued the Student's placement at Meliora Academy. *Id.* at 4 ¶ 9. In November of that year, however, the Ellington Board of Education proposed to change the Student's placement to one of its in-district programs. *Id.* Before this placement was implemented, the Student's family moved to Glastonbury. *Id.* at 4 ¶ 10.

The Student registered with Glastonbury Public Schools on August 28, 2018, and the Glastonbury Board of Education convened a PPT meeting to address the Student's transition to the district on August 31, 2018. *Id.* "At that time, the PPT decided to continue the Student's placement at Meliora Academy while it conducted a multidisciplinary evaluation." *Id.* At the

Team meeting, the PPT also "developed an IEP for the Student which mirrored his program at Meliora." *Id.* at 4 ¶ 11.

The Board performed its multidisciplinary evaluation during the fall of 2018. *Id.* at 5 ¶ 19. "The reports of the evaluation, as well as the Student's progress at Meliora Academy, were presented" at a PPT meeting on January 30, 2019. *Id.* The Student's parents attended this PPT meeting held on January 30, 2019 and were represented by counsel. *Id.* At the meeting, the Team reviewed findings from a Psychoeducational Evaluation, a Weschler Individual Achievement Test (WIAT-III), a speech and language evaluation report, a physical therapy evaluation, an occupational therapy evaluation, a Behavioral Consultation Summary, the Verbal Behavior Milestones Assessment and Placement Program test (VB-MAPP), and a report of the Student's feeding program. *Id.* at 5–8 ¶¶ 20–37.

"Using the multidisciplinary evaluation and other reports presented at the January 30, 2019 meeting, the Student's PPT developed an [IEP] for the second half of the 2018-2019 school year." *Id.* at 8 ¶ 38. "The 2019 IEP identified the Student's current levels of performance in the Present Levels of Academic Achievement and Functional Performance section." *Id.* at 8 ¶ 39. Additionally, the PPT identified eight areas of "[c]oncern/[c]hallenges/[n]eeds requiring specialized instruction and related services." *Id.* (internal quotation marks omitted). The 2019 IEP also provided a set of "Annual Goals and Objectives" targeting each of these areas. *Id.* at 9 ¶ 40.

Hearing Officer Bird found that "the Annual Goals and Objectives of the 2019 IEP target the same learning areas as those of the 2018 IEP". *Id.* at 9 ¶ 41. "Although some language was changed and some objectives were combined or restated, the 2019 IEP reflects consistency and continuity in carrying out the goals and objectives of the Student's 2018 IEP." *Id.* Additionally,

the "Program Accommodations and Modifications were virtually identical to those contained in the 2018 IEP." *Id.* at 9 ¶ 42. "Among the most significant of these Program Accommodations and Modifications are Behavior Interventions and Support of an adaptive work space, clear work area, minimizing transitions[,] and reduction of auditory or visual stimulation." *Id.* at 10 ¶ 43. The Program Accommodations and Modifications also included a "specific feeding plan with 5 minute 'warm up' prior to feeds, G-Tube feedings, a sterile environment, and paraprofessional support for all areas of the day." *Id.* at 10 ¶ 44.

The 2019 IEP further sets forth the special education and related services to be provided to implement the Goals and Objectives stated in the IEP. *Id.* at 10 ¶ 45. Hearing Officer Bird found that the "2019 IEP included the same mix of instructional and related services as did the 2018 IEP, with somewhat less time devoted to academic instruction in order to provide more time per week for feeding and oral motor therapy", a suggestion form Meliora Staff that the Board chose to implement. *Id.* at 11 ¶ 46. Additionally, "the 2019 IEP offered the same number of hours of service per school day (6.75 hours) over the same five days per week as provided in the 2018 IEP." *Id.* at 11 ¶ 48.

"The 2019 IEP was to be implemented at the Board of Education's PRIDE Program (PRIDE)", which is a "self-contained special education program that is housed at the Board of Education's Nayaug School." *Id.* at 11 ¶ 50. "[The] Nayaug School also serves a population of about 500 mainstream students." *Id.* "PRIDE is a small, highly structured and individualized program for students in Grades Kindergarten through Five who experience autism or related disabilities." *Id.* at 11 ¶ 51. The PRIDE program "consists of two classrooms connected by a sensory room" and has its "own restroom and separate entrance, so that students need not enter or use any part of the larger school environment". *Id.* at 11 ¶ 52. "PRIDE currently serves ten

students, eight of which work with one teacher and are based in the larger of the classrooms
while the other two work with the other teacher and are based in the second classroom." *Id.* at 12
¶ 53.

The Student was to become a part of the classroom of about eight students, where most of
the students spend as much as 80% of their time in the mainstream school environment. *Id.* at 12
¶¶ 53, 54. Each student in the larger classroom receives "one to one paraprofessional[]" support
for "academic, therapeutic[,] and behavioral needs." *Id.* at 12 ¶ 54. PRIDE is staffed with a
"transdisciplinary team" of two teachers, an occupational therapist, a physical therapist, a speech
and language therapist, a board-certified behavior analyst ("BCBA"), a school psychologist, and
one-to-one paraprofessionals for each student. *Id.* at 12 ¶ 55. This team "meets frequently" to
review data and "collaborate on student needs." *Id.* PRIDE's occupational and speech language
therapists are "trained and experienced in oral motor therapy and feeding." *Id.* at 12 ¶ 56. The
Board of Education also hired a feeding consultant to consult with the Student's feeding team.
*Id.*

The Student's parents disagreed with this proposal and provided the PPT with three
letters from the Student's physicians recommending his continued placement at Meliora.[2] *Id.* at
12 ¶ 59. "Although the letters were considered by the PPT, the parents' objection to PRIDE did
not prevail." *Id.* at 13 ¶ 61. At the conclusion of the PPT meeting, the Student's attorney
announced that the Student "objected to the proposed PRIDE placement, and that the [S]tudent
would file a request for due process." *Id.* at 13 ¶ 62.

---

[2] Hearing Officer Bird also found that none of the physician letters submitted for the January 30, 2019 PPT "stated a
fact based [*sic*] objection to the placement at PRIDE." *Id.* at 13 ¶ 60. "None [of the physicians] stated that the
Student requires a private classroom or that he is too immune deficient to attend public school." *Id.* The Hearing
Officer further noted that two of the physicians had previously recommended class sizes exceeding that of the
Student's individual class currently in place at Meliora. *Id.*

The parents were invited to tour the PRIDE program, which they did. *Id.* at 13 ¶ 61. A second PPT meeting was planned for the discussion of transition activities, but the Student's parents did not attend. *Id.* at 13 ¶ 63. No further steps were taken at this point as "the Student ha[d] announced his intention to request due process." *Id.*

The Hearing Officer found that, at Meliora, the Student belongs to a team of seven students of his general age group under the supervision of a general education teacher. *Id.* at 13 ¶ 65. While he receives most of his education and services "in his own private classroom", he "occasionally accesses the adjoining service room and other areas of the school, . . . where he is in the company of many other students." *Id.* "At least a few times each week, the Student participates with as many as six peers". *Id.* at 13 ¶ 66. However, "[s]ince Meliora Academy only serves disabled students, he does not have access to nondisabled peers." *Id.*

Between August 30 and October 17, 2018, the Student's private classroom was "unilaterally abandoned . . . when the Student was placed in a group classroom with two other students". *Id.* at 13–14 ¶ 67. "[N]either the Student's behavior nor his academic performance was negatively affected by his assignment to the group classroom." *Id.* The Student was returned to his private classroom "because his parents expressed concern for his health due to exposure to other children." *Id.* at 14 ¶ 68. The Hearing Officer noted that the attendance record did not reflect that the inclusion of the Student in the group classroom had any impact on his attendance. *Id.*

The Board of Education committed to following "precisely the same protocols for disease control and respiratory hygiene at PRIDE as set forth in [the] Meliora Health Plan." *Id.* at 14 ¶ 71. Meliora Academy had "developed and implemented a Health Plan for the Student to address

his cardiac and gastrostomy needs," which was not part of the 2018 IEP.[3] *Id.* at 14 ¶¶ 69–70.

As a result of these findings, Hearing Officer Bird found that Glastonbury provided a FAPE to the Student from the date of the PPT meeting on or about January 30, 2019 for the remainder of the 2018-2019 school year. *See id.* at 1–21.

### i.  Procedural Claims

The Hearing Officer determined that the evidence presented "established that the Board of Education did fulfill its procedural obligations under [the] IDEA with regard to the 2019 IEP." *Id.* at 16 ¶ 9. The Hearing Officer further determined that, even if a procedural violation did occur, "the evidence showed that there was no significant impact on the Student's parents' participation in the IEP process or the Student's educational benefits." *Id.* at 18 ¶ 24.

First, Hearing Officer Bird found that "the PPT developed an IEP that included specialized instruction, related services, measurable annual goals and objectives[,] and program accommodations and modifications that were designed to meet each of the student's educational needs." *Id.* at 16 ¶ 10.

The Hearing Officer also found that the parents "participated in the process and their views were taken into account[,]" as the evidence "demonstrated that the Student's parents attended the PPT meetings involved in developing the 2019 IEP and were represented by counsel." *Id.* at 16 ¶ 11. "In the absence of consensus among PPT members, as in this case, the Board of Education was responsible for the choice of a special education placement, not the parents." *Id.* at 17 ¶ 13 (internal citation omitted).

Further, Hearing Officer Bird determined that the evidence did not suggest that "the Board of Education predetermined the PRIDE placement outside of the PPT process." *Id.* at 17 ¶

---

[3] "Both the 2018 and 2019 IEP's, however, include 'sterile environment' as part of the Program Accommodations and Modifications." Final Decision at 14 ¶ 70.

14. In support of this conclusion, Hearing Officer Bird noted that the district conducted a multidisciplinary evaluation which "demonstrated that the Student's needs can be met in a less restrictive public school setting". *Id.* Additionally, she concluded that the "fact that the Board of Education retained the services of a feeding specialist is not evidence of predetermination" but rather a component of the Board's planning to meet the Student's needs. *Id.* at 17 ¶ 15.

Hearing Officer Bird also found that Glastonbury did not commit a procedural violation by "removing 'areas of need' and eliminating objectives from [the Student's] program", because the 2019 IEP addresses "precisely the same areas of need" as those in the 2018 IEP. *Id.* at 17 ¶ 16. The sole exception was determined to be the substitution of some oral motor therapy for academic support at the recommendation of Meliora Academy staff. *Id.* Further, minor differences between the 2018 and 2019 IEPs, including slightly fewer objectives, "were not procedurally inappropriate", as they reflect a difference in style of expression and instructional techniques, rather than a change in services. *Id.* at 17 ¶ 17. The measurability of the goals in the 2019 IEP also was affirmed. *Id.* at 17 ¶ 18–19.

Finally, the Hearing Officer determined that the failure of the 2019 IEP to reflect a two-hour recess for professional development during much of the school year did not constitute a procedural violation. *Id.* at 18 ¶ 20. The Hearing Officer concluded that "it would be speculative to conclude that the Board of Education would not or could not have implemented the 2019 IEP as written" because the 2019 IEP was never actually implemented, and that, even if Glastonbury did not adhere strictly to the service hour provision, the loss of approximately five percent of service time over an entire school year did not amount to a material violation. *Id.* at 18 ¶¶ 21–23 (internal citations omitted).

### ii. Substantive Claims

The Hearing Officer also concluded that "the evidence in this case established that the 2019 IEP was reasonably calculated to allow the Student to make appropriate progress in light of his individual circumstances, including his medical needs." *Id.* at 19 ¶ 29. Specifically, the accommodations and modifications provided in the 2019 IEP were "highly individualized", as they were based on recent evaluations and nearly identical to the 2018 IEP, which was endorsed by the Parents. *Id.* at 19 ¶¶ 29, 30.

Further, the Hearing Officer found that the "only significant difference" between the two IEPs was that the 2019 IEP provided for a "less restrictive environment" because it would be implemented in "a public school in the Student's home community of Glastonbury." *Id.* at 19 ¶ 30. Because the "IDEA requires that, when possible, students should be educated in the school they would have attended if not disabled and as close to their home as possible", this setting is "less restrictive" than his placement at Meliora. *Id.* at 19 ¶ 31.

As to the Student's health concerns, the Hearing Officer found that "the Student's health would not be unreasonably threatened by attendance in the less restrictive environment of PRIDE." *Id.* at 19–20 ¶ 32. Specifically, PRIDE uses "reasonable infection control protocols" such as disinfecting classrooms, hallways, and other facilities "at least daily", "[i]t [ ] sanitizes surfaces", encourages staff and students to wash their hands, and excludes staff and students who are contagious. *Id.* At PRIDE, the Student would be exposed to "approximately the same number of staff members providing him with services as he was at Meliora Academy" and "have about the same number of peers in his team or classroom group". *Id.* at 20 ¶ 33. Further, the Hearing Officer found that the "small size and structure of PRIDE" allows for screening of "possible

contagion" and subsequent separation "roughly as feasible as at Meliora Academy." *Id.* at 20 ¶ 34.

Finally, the Hearing Officer found that the Student does not require a private classroom. "None of the Student's medical team recommended a private classroom for the Student due to distractibility" and the "2018 IEP[,] which the Student endorses, does not provide a private classroom." *Id.* at 20 ¶ 36, 37. The IEP does provide, however, for "an array of supports and services that are reasonably calculated to address his need in this area," including a one-to-one paraprofessional, a behavior plan, a "clear work area" and "reduction of auditory or visual stimulation" in a "small[,] structured learning environment". *Id.* at 20 ¶ 37.

The Hearing Officer then concluded that, because the 2019 IEP was substantively and procedurally appropriate, it was not necessary to consider whether Meliora Academy is an appropriate placement for the Student or whether the Student should be placed there.[4] *Id.* at 21 ¶¶ 41–44.

## II.   PROCEDURAL HISTORY

On May 18, 2020, the Parents filed a Complaint against Glastonbury, thereby appealing the final administrative decision dated April 17, 2020 of Hearing Officer Ann Bird. *See* Compl.

On September 30, 2020, Parents filed a motion for judgment on the administrative record. Pl.'s Mot. for J. on the Admin. R., ECF No. 17 (Sept. 30, 2020).

---

[4] The Hearing Officer did not include placement for the 2019-2020 School Year in the scope of her decision for several reasons. First, the evidentiary portion of the case was not completed until February 12, 2020. *Id.* at 21 ¶ 43. On March 15, 2020, all Connecticut public schools were closed by the Governor's Executive Order 7C due to the COVID-19 pandemic and were scheduled, at the time of the Hearing Officer's decision, to remain closed until May 20, 2020. *Id.* There would have only been a few days remaining of the 2019-2020 school year by the time the Hearing Officer's decision was issued, and, as such, "the question of the Student's program for the 2019-2020 [s]chool [y]ear [was] virtually moot". *Id.* Second, the Hearing Officer found that "the scope of th[e] due process hearing cannot be stretched to include the 2019-2020 School Year." *Id.* at 21 ¶ 44. The due process request that was submitted on April 10, 2019 challenged only the 2019 IEP, "which by its terms expired with the conclusion of the 2018-2019 School Year." *Id.* As there was no agreement by the parties to address the 2019-2020 School Year as part of this case, it "is not a part of this case and is not addressed in [the] Final Decision and Order." *Id.*

On October 30, 2020, the Board filed a memorandum in opposition to the Parents' motion, *see* Opp'n to Parents' Mot. for J. on the Admin. R., ECF No. 18 (Oct. 30, 2020), and an accompanying cross-motion for judgment on the administrative record, *see* Glastonbury Bd. of Educ.'s Mot. for J., ECF No. 19 (Oct. 30, 2020).

On November 13, 2020, Parents filed a reply to the Board's cross-motion. *See* Pl.'s Reply Mem. in Supp. of its Mot. for J. on the Admin. R., ECF No. 20 (Nov. 13, 2020). Neither party, however, filed the administrative record with the Court.

The Court denied the parties' cross-motions without prejudice to renewal and ordered the parties to refile their motions for judgment with the full administrative record by October 1, 2021. *See* Order, ECF No. 21 (Sept. 16, 2021).

On September 30, 2021, the parties filed the administrative record with the Court. *See* Admin. R., ECF No. 26 (Sept. 30, 2021).

That same day, Plaintiffs renewed their motion for judgment on the administrative record, *see* Pl.'s Mot. for J. on the Admin. R., ECF No. 27 (Sept. 30, 2021); Pl.'s Mot. for J. on the Admin. R., ECF No. 29 (Sept. 30, 2021) ("Pl. Mot. for J."), as well as their reply, *see* Pl.'s Reply Mem. in Supp. of its Mot. for J. on the Admin. R., ECF No. 28 (Sept. 30, 2021) ("Reply").

Defendants also renewed their cross-motion for judgment on the administrative record, *see* Glastonbury Bd. of Educ.'s Mot. for J., ECF No. 31 (Sept. 30, 2021), and their opposition to the Parents' motion for judgment, *see* Opp'n to Parents' Mot. for J. on the Admin. R., ECF No. 30 (Sept. 30, 2021) ("Opp'n").

## III.    STANDARD OF REVIEW

Under the IDEA, "Congress provides federal funds to those states that develop plans to assure 'all children with disabilities the right to a free appropriate public education.'" *Walczak v.*

*Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (quoting 20 U.S.C. § 1412(1)). A FAPE "must include special education and related services tailored to meet the unique needs of a particular child, . . . and be reasonably calculated to enable the child to receive educational benefits." *Id.* (internal quotation marks and citations omitted). "[A] child remains eligible for a free appropriate education under IDEA until his 22nd birthday." *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 86 n.4 (2d Cir. 2005). But, "[u]nder Connecticut law, an individual with a disability is entitled to receive special education until he or she 'is graduated from high school or reaches age twenty-one, whichever occurs first.'" *A.R. v. Conn. State Bd. of Educ.*, No. 3:16-CV-01197 (CSH), 2020 WL 3086032, at *4 (D. Conn. June 10, 2020) (emphasis omitted) (quoting Conn. Gen. Stat. § 10-76d(b)).

Summary judgment in the IDEA context "involves more than looking into disputed issues of fact; rather, it is a pragmatic procedural mechanism for reviewing administrative decisions." *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009) (internal quotation marks and citation omitted). The IDEA left the "primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, . . . to state and local educational agencies in cooperation with the parents or guardian of the child." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982). Consequently, "the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed" and they must give "due weight" to the administrative proceeding below. *Gagliardo v. Arlington C. Sch. Dist.*, 489 F.3d 105, 112–113 (2d Cir. 2007) (internal quotation marks and citation omitted). So, while a federal court "must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence," it must also be "mindful that

the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Id.* at 112–13 (internal quotation marks, citations, and alterations omitted).

"The standard of review requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review." *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014) (internal quotation marks and citation omitted). "The deference owed depends on both the quality of the opinion and the court's institutional competence." *Id.* Deference to the decision reached in the administrative proceeding is particularly warranted where, as here, the Court's decision is based only on the administrative record. *Gagliardo*, 489 F.3d at 113 (internal citation omitted).

"The party appealing [a Hearing Officer's] determination bears the burden of proof in establishing that the [Hearing Officer's] decision is not entitled to deference." *J.C. ex rel. C.C. v. N.Y.C. Dep't of Educ.*, No. 13-CV-3759 (PGG) 2015 WL 1499389, at *14 (S.D.N.Y. Mar. 31, 2015), *aff'd sub nom. J.C. v. N.Y.C.  Dep't of Educ.*, 643 F. App'x 31 (2d Cir. 2016) (summary order); *see also Mr. & Mrs. G. ex rel. S.G. v. Canton Bd. of Educ.*, No. 3:17-CV-2161 (MPS), 2019 WL 1118094, at *7 (D. Conn. Mar. 11, 2019) (citing the same). "However, with respect to matters of statutory interpretation, the Court reviews the administrative decision *de novo*." *Doe v. Westport Bd. of Educ.*, No. 3:18-CV-01683 (KAD), 2020 WL 869861, at *2 (D. Conn. Feb. 21, 2020) (citing *Muller ex rel. Muller v. Comm. on Special Educ. of E. Islip Union Free Sch. Dist.*, 145 F.3d 95, 102 (2d Cir. 1998)).

## IV.   DISCUSSION

### A.  Procedural Compliance

The IDEA "provides a variety of procedural safeguards for the parents of disabled

children." *Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 741 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 322 (2018) (citing *Lillbask*, 397 F.3d at 81–82). "A procedural violation of the IDEA entitles a plaintiff to relief only if it: '(I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decision[-]making process regarding the provision of a [FAPE] to the parents' child; or (III) caused a deprivation of educational benefits.'" *Id.* at 748 (alteration in original) (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)) (citing *A.M. v. N.Y.C. Dep't of Educ.*, 845 F.3d 523, 535 (2d Cir. 2017)).

"That is, parents must articulate how a procedural violation resulted in the IEP's substantive inadequacy or affected the decision-making process." *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.,* 725 F.3d 131, 139 (2d Cir. 2013). However, "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012) (internal citation omitted).

Plaintiffs argue that Glastonbury committed the following procedural violations: (1) removal of programming in areas of need, including "objectives in the area[s] of math, developmental skills, emotions, physical therapy, social reciprocity and relatedness, without data or reason to do so"; (2) failure to develop measurable IEP goals; (3) inaccurate designation of service hours; (4) denial of meaningful parental participation in PPT Team meetings; (5) failure to consider letters from J.O.'s doctors; and (6) predetermination of placement. Pl. Mot. for J. at 26–30. As a result of these procedural violations, the Parents argue that Glastonbury "impeded [their] . . . participat[ion] in the decision-making process regarding the provision of a FAPE to [ ] [S]tudent, or caused a deprivation of educational benefits." *Id.* at 26 (citing 20 U.S.C. § 1415(f)(3)(E)(ii); 34 C.F.R. § 300.513(a)(2)).

The Board contests each of these alleged procedural violations. As to the first three

alleged violations, the Board argues in favor of deference to the Hearing Officer's finding that

the January 30, 2019 IEP "addresses the same services at the same levels as did the 2018 IEP

with the sole exception of substituting some oral motor therapy for some academic support at the

recommendation of Meliora Academy staff[,]" albeit with some stylistic differences. Opp'n at 23

(quoting Final Decision at 17 ¶ 16). The Board also contends that the proposed 2019 IEP offered

adequate data collection, as determined by the Hearing Officer, and that any claim that the

district would not provide all service hours in the IEP was merely speculative. *Id.* at 23–24.

   As to the remaining alleged procedural violations, the Board contends that it provided

Parents copies of the completed evaluations, provided adequate notice of the January 30, 2019

meeting, and provided draft goals and objectives for Parents to review before the meeting. *Id*. at

24–25 (citing Final Decision at 5 ¶ 19–20; Email Correspondence at 17–19, ECF No. 26-18 (Jan.

8, 24, and 25, 2019) ("B-25")). Glastonbury also contends that, during the January 30, 2019 PPT

meeting, Parents meaningfully participated because they attended the meeting with an attorney,

were offered the opportunity to ask questions about the evaluations and proposed goals and

objectives, asked questions, offered three physician letters, and expressed their clear and

immediate disagreement with the proposed placement. Opp'n at 25 (citing Final Decision at 16 ¶

11–13).

   The Court disagrees, at least as to the conclusion.

   The requirement of parental participation under the IDEA involves "more than mere

presence" at the Team meeting. *W.A. ex rel. W.A. v. Pascarella*, 153 F. Supp. 2d 144, 154 (D.

Conn. 2001) (quoting *V.W. v. Favolise*, 131 F.R.D. 654, 659 (D. Conn. 1990)). "[I]t means being

afforded the opportunity to be an equal collaborator, whose views are entitled to as much

consideration and weight as those of other members of the team in the formulation and

evaluation of their child's education." *W.A.*, 153 F. Supp. 2d at 154 ; *see also E.H. v. N.Y.C. Dep't of Educ.*, 164 F. Supp. 3d 539, 552 (S.D.N.Y. 2016) (stating that the IDEA contemplates that "each child with special needs will receive an appropriate education through the collaborative process between the [school district] and the parent(s)" (citing *J.G. ex rel. N.G. v. Kiryas Joel Union Free Sch. Dist.*, 777 F. Supp. 2d 606, 648 (S.D.N.Y. 2011)).

In accordance with the requirement that parents receive an opportunity to collaborate, and to have their views considered, a school district cannot predetermine the contents of an IEP in advance of a Team meeting. *See E.H.*, 164 F. Supp. 3d at 552 ("Predetermination is inconsistent with the goals of the IDEA, which envision a collaborative process in developing a uniquely suitable educational placement for each child." (citing, *inter alia*, 20 U.S.C. § 1415(b)(1)). Predetermination is a procedural violation of § 1415 and may "rise to the level of a substantive harm, and therefore deprive a child of a [FAPE], where the child's parents are effectively deprived of meaningful participation in the IEP process." *J.G.*, 777 F. Supp. 2d at 648 (internal quotation marks and citation omitted).

The Second Circuit has held that "preparatory activities" that fall short of a pre-meeting agreement are not synonymous with predetermination where "parents meaningfully participated in the [IEP Team] meeting." *T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 253 (2d Cir. 2009) (per curiam) (internal citation omitted); *see also* 34 C.F.R. § 300.501(b)(1) & (b)(3) (2006) (allowing school district to conduct, without the parents, "preparatory activities that public agency personnel engage in to develop a proposal or response to a parent proposal that will be discussed at a later meeting"). The Second Circuit, however, has not yet found evidence of predetermination that would deprive parents of an opportunity for parental participation, or otherwise deny FAPE. *See T.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869,

877 (2d Cir. 2016) (finding that school district's refusal to discuss bullying in development of IEP amounted to "a procedural denial of a FAPE similar to other procedural violations that our sister circuits have held to constitute denials of a FAPE, such as the predetermination of an issue prior to an IEP meeting"); *cf. Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 855–59 (6th Cir. 2004) (finding predetermination where the school district "had an unofficial policy of refusing to provide one-on-one ABA programs and . . . thus did not have open minds and were not willing to consider the provision of such a program").

Ordinarily, this Court would defer to the Hearing Officer's findings as to the issue of predetermination and parental participation in the Team meeting process. Here, however, the Hearing Officer's opinion did not analyze the record to determine whether the Parents had an opportunity for meaningful participation in the January 30, 2019 PPT Team meeting or whether the Board predetermined the Student's placement.

The Hearing Officer found that the fact that the Parents did not secure placement at Meliora "does not mean they were denied a meaningful opportunity to participate in the placement discussion or that their input was not considered[,]" and that, "in the absence of a consensus among PPT members", the Board "was responsible for the choice of a special education placement, not the parents." Final Decision at 17 ¶ 13. Hearing Officer Bird also found that no predetermination occurred because the multidisciplinary evaluation, as well as testimony from the Student's private school teacher and administrator, supported that the Student's needs could be met in a less restrictive school setting. *See id.* at 17 ¶ 14. These findings, while potentially relevant to the substantive appropriateness of the program proposed for the Student in the 2019 IEP, are inapposite to the procedural inquiry of whether there was a pre-meeting agreement as to the Student's placement or whether the Parents' views were appropriately

considered in the Team meeting process.[5]

The Hearing Officer also concluded that "the parents participated in the process and their views were taken into account", where they "attended the PPT meetings involved in developing the 2019 IEP" and "were represented by counsel". *See id.* at 16 ¶ 11. But the record reveals that two of the three letters provided by the Parents from their child's physicians were not read, much less considered or discussed, at the January 2019 IEP Team meeting; indeed, the Board's Director of Special Education, Diana Kelley, testified that the Board "did not read all three letters, no" and that only "[o]ne letter was . . . reviewed and considered." Admin. Hr'g Tr. at 59, 77–78, ECF No. 26-5 (Oct. 2, 2019) ("T. 10/2/19").

The Court therefore finds that, in regard to her findings as to parental participation and predetermination, Hearing Officer Bird's opinion is not supported by a preponderance of the relevant evidence, and the Court does not defer to her analysis. *See E.H.*, 164 F. Supp. 3d at 553 ("In light of the fact that the [hearing officer] failed to analyze the record to answer the relevant question of whether the Parent was denied meaningful opportunity to participate with respect to her concern that [the student] required a more restrictive setting than 6:1:1, the [hearing officer's] finding is not supported by a preponderance of the relevant evidence[.]"); *see also C.F.*, 746 F.3d at 77 (courts need not defer to a decision that is "insufficiently reasoned"); *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 239 (2d Cir. 2012) ("Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not." (internal citation omitted)).

---

[5] The Hearing Officer also concluded that the "fact that the Board of Education retained the services of a feeding specialist is not evidence of predetermination", but rather a component of the Board's planning to meet the student's needs. *Id.* at 17 ¶ 15. This analysis also is not entitled to deference, as the relevant inquiry is not whether hiring the feeding specialist was inappropriate, but rather whether the feeding specialist's testimony at the hearing provided evidence of predetermination.

An independent review of the record does not reveal the Board engaging in mere "preparatory activities," such as preparing a draft IEP for the Team's consideration, *see, e.g.*, *M.M. ex rel. A.M. v. N.Y.C.  Dep't of Educ. Region 9 (Dist. 2)*, 583 F. Supp. 2d 498, 506 (S.D.N.Y. 2008) ("So long as they do not deprive parents of the opportunity to meaningfully participate. . . draft IEPs are not impermissible under the IDEA."), that are permissible within the limits of the IDEA, *see also T.P.*, 554 F.3d at 253 (rejecting alleged predetermination violation where school district employees allegedly "discussed" recommendation from a behavioral consultant with that evaluator "before the meeting"). Rather, there is substantial evidence in the record to suggest that district staff agreed to alter the Student's placement before the multidisciplinary evaluation and PPT meeting, thereby impeding parental participation.

On August 31, 2018, the head nurse for Glastonbury Public Schools wrote a note stating that a meeting was held with the "team to create [an] IEP and plan to return to GPS [Glastonbury Public Schools] school." Visit Summary, ECF No. 26-21 (Aug. 31, 2018) ("B-52"); *see also* Admin. Hr'g Tr. at 183–84, ECF No. 26-9 (Jan. 22, 2020) ("T.1/22/20"). The note is dated August 31, 2018. *See* B-52*.* The IEP developed at that time, however, reflects no such plan.[6] *See* Individualized Education Program, ECF No. 26-17 (Aug. 31, 2018) ("B-23"). The hearing transcript also does not reflect that any in-district programs were discussed at the August 31,

---

[6] The IEP developed in August of 2018, when Student first enrolled in the District, appropriately reflects placement in Student's "stay-put" program at Meliora Academy. "The stay-put provision of the IDEA provides that 'during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child.'" *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 452 (2d Cir. 2015) (citing 20 U.S.C. § 1415(j)). "To determine a child's 'then-current educational placement,' a court typically looks to . . . the placement described in the child's most recently implemented IEP[.]" *Id.*).

2018 PPT Team meeting.[7] Admin. Hr'g Tr. at 69, ECF No. 26-4 (June 28, 2019) ("T. 6/28/19");
T. 10/2/19 at 32–33.

These facts in the administrative record, which are not addressed in the Hearing Officer's
decision, preclude judgment as a matter of law to the Board as to procedural compliance with the
IDEA, at least as to the alleged predetermination of placement and denial of meaningful parental
participation.

The Court also, however, lacks a basis upon which to grant judgment as a matter of law
to the Plaintiffs. To the extent that failure to observe procedural requirements of the IDEA can
constitute a violation of the statute in its own right, the cases where procedural violations have
been so egregious so as to entitle parents to relief exceed the facts alleged here, *see, e.g.*, *L.O. v.
N.Y.C. Dep't of Educ.*, 822 F.3d 95, 123–24 (2d Cir. 2016) (finding denial of a FAPE as a result
of cumulative procedural errors, including, *inter alia*, "no record evidence that the [IEP Team]
reviewed any evaluative materials in developing any of [the Student's] IEPs"; evidence that the
district "failed to conduct [a Functional Behavioral Assessment] for any of the IEPs, despite
finding that [Student] possessed behaviors that interfered with learning"; and "omission of any
annual goals or short-term objectives" related to Student's pica or physical therapy needs); *see
also Briere v. Fair Haven Grade Sch. Dist.*, 948 F. Supp. 1242, 1255 (D. Vt. 1996) (procedural
violations constituted denial of FAPE where IEP team, *inter alia*, told the parents that an
alternative educational placement "would not be discussed" and "delay[ed] IEP Team meetings
for 23 months"), including in other circuits that have articulated a standard for assessing

---

[7] In addition, the testimony of the feeding consultant hired by the Board at hearing also may suggest the existence of
a premeeting agreement as to J.O.'s placement. The feeding consultant testified that the Board was going to be
"bringing him or proposing to bring him" back to the district. Admin. Hr'g Tr. at 57, ECF No. 26-10 (Feb. 12, 2020)
("T. 2/12/20").

predetermination claims, *see, e.g.*, *Deal*, 392 F.3d at 858 (denial of FAPE where school district

"had an unofficial policy of refusing to provide one-on-one ABA programs").

The Court therefore cannot determine, on the record before it, that the alleged

predetermination and denial of parental participation—or, indeed, any other procedural

violations that may have occurred, in isolation or in aggregate—were so egregious as to entitle

the Parents to relief as a matter of law. *See W.A.*, 153 F. Supp. 2d at 154 ("[T]o the extent a

failure to observe the procedural requirements of [the] IDEA can constitute a violation of the

statute in its own right, the cases where procedural violations have been so egregious so as to

amount to a denial of educational opportunity far exceed the facts alleged in this case.").

Accordingly, the parties' cross-motions for summary judgment on the alleged procedural

violations of the IDEA will be denied.

### B.  FAPE and Least Restrictive Environment

The IDEA "requires an educational program reasonably calculated to enable a child to

make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v.

Douglas Cty. Sch. Dist.*, 137 S. Ct. 988, 1001 (2017). "While the 'IDEA does not itself articulate

any specific level of educational benefits that must be provided through an IEP,' 'the door of

public education must be opened for a disabled child in a meaningful way. This is not done if an

IEP affords the opportunity for only trivial advancement.'" *Mr. P*, 885 F.3d at 757 (quoting

*A.M.*, 845 F.3d at 541) (internal quotation marks and citations omitted).

In addition to providing an education that is likely to produce progress and tailored to the

unique needs of the child, a school district must offer students an educational program "in the

'least restrictive setting consistent with [their] needs." *M.H.*, 685 F.3d at 224 (internal quotation

marks and citation omitted); *see also Avaras ex rel. A.A. v. Clarkstown Cent. Sch. Dist.*, No. 18-

CV-6964, 2019 WL 4600870, at *2 (S.D.N.Y. Sept. 21, 2019) ("In addition to providing an education that is likely to produce progress and tailored to the unique needs of the child, the program must be offered in the least restrictive environment." (citing 20 U.S.C. § 1412(a)(5)(A)).

"[D]etermining whether a student has been placed in the 'least restrictive environment' requires a flexible, fact-specific analysis." *P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Ed.*, 546 F.3d 111, 113 (2d Cir. 2008). First, a court should consider "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child." *Id.* at 120 (internal quotation omitted). If a child cannot be educated in a regular classroom, then courts should determine "whether the school has mainstreamed the child to the maximum extent appropriate." *Id.* (internal quotation omitted).

The least restrictive environment requirement, however, "is not absolute," and "does not require a school district to place a student in the single least restrictive environment in which he is capable of any satisfactory learning." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 162 (2d Cir. 2014). This is because "the presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education to handicapped students." *Newington*, 546 F.3d at 119. Thus, "the IDEA contemplates [consideration of] a continuum of related services and options that will be a 'best fit' for the student in question," and achieve an "optimal result across the two requirements." *M.W.*, 725 F.3d at 146; *A.K. v. Westhampton Beach Sch. Dist.*, No. 17-CV-0866 (GRB) (SIL), 2021 WL 621236, at *8 (E.D.N.Y. Jan. 6, 2021), *report and recommendation adopted*, 2021 WL 665277 (E.D.N.Y. Jan. 25, 2021) (citing the same).

The Parents assert that Glastonbury's proposed programming is insufficient, resulting in a

substantive violation of the IDEA, as it lacks sufficiently individualized and intensive services in all areas of need, including academics, social skills, speech and language, behavior, attention, fine motor skills, gross motor skills, oral motor skills and feeding, and ignores the severity of Student's immunocompromised condition. Pl. Mot. for J. at 30–34. In particular, the Parents argue that the Board's proposed placement of Student in a classroom of up to ten students at PRIDE is inappropriate for J.O., "as he cannot be adequately protected from illness in that setting." Reply at 4. The Parents also contend that, even if the placement did not "ignor[e] the severity of J.O.'s medical situation," the proposed IEP and placement at PRIDE would be inappropriate because J.O. requires a classroom size of less than ten students due to his distractibility, and, further, because the IEP developed by the district "lack[s] specifics about how it would implement a feeding plan." *Id.* at 31–32.

The Parents also argue, regardless of whether the IEP offers FAPE, that PRIDE does not constitute the least restrictive environment for Student, given his medical fragility and compromised immune system. Pl. Mot. for J. at 34–35. At PRIDE, Plaintiffs contend that Student would "spend his day in a cubby," which is more restrictive than his current placement at Meliora. *Id.* at 5. The Parents argue that Meliora is less restrictive than PRIDE, even though it is not in a public school environment, because it is "safe" and only provides "expo[sure] to healthy peers," including in "specials such as music and art" that the Board has not offered for Student at PRIDE. *Id.*

The Board argues in favor of deference towards the Hearing Officer's determination that the January 30, 2019 IEP provided FAPE in the least restrictive environment. Opp'n at 31–36. As to the appropriateness of the proposed IEP, the Board contends that it proposed a program tailored to the Student's individual needs, including his needs related to sanitation and infection.

*Id.* at 32–33. They offer in support of their position evidence presented at the hearing that the Student has not missed more than two consecutive days of illness since the 2015-2016 school year and that PRIDE implements infection protocols that would promote continued health and good attendance for Student. *Id.*

The Board also rejects any allegation that the Student requires a private classroom due to distractibility, or that the feeding plan was inappropriate or incomplete. Opp'n at 3. In further support of its position, the Board contends that the 2019 IEP must be appropriate, as "the 2019 IEP is nearly identical to the 2018 IEP[,] which the Student's parents endorse[.]" *See* Opp'n at 32, 34 (citing Final Decision at 19 ¶ 30).

Finally, the Board contends that PRIDE represents the least restrictive environment for the Student because, at Meliora, the Student lacks any access to non-disabled peers and "receives the majority of his instruction and services in a 1:1 classroom, [ ] with limited interaction with other students or community activities." *Id.* at 36. The Board concedes that, according to the 2019 IEP, "[Student] would not have access to those [non-disabled] students initially." *Id.* Nevertheless, the Board asserts that PRIDE's "location in a public school in his community makes it less restrictive than the private school setting in another town." *Id.* (citing Final Decision at 19 ¶ 31 (internal quotation marks omitted)).

The Court disagrees, at least as to the conclusion.

The school authorities must provide a "cogent and responsive explanation" for their decisions "that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Endrew F.*, 137 S. Ct. at 1002. Even if the placement at PRIDE is appropriate to meet the Student's medical needs, an explanation as to the Student's other relevant circumstances, including the timing of the proposed transition and need for

specialized consultation supports around related services and feeding, is lacking on the record before the Court.

Hearing Officer Bird found that the new IEP proposed for Student was "reasonably calculated to allow the Student to make appropriate progress in light of his individual circumstances, including his medical needs." Final Decision at 19 ¶ 29. In support of this conclusion, she offered the following evidence:

- The instructional and related services, accommodations, modifications, and goals and objectives "offered in the 2019 IEP were all highly individualized on the basis of recent evaluations of the Student[]". *Id.*

- "The only significant difference" between the 2018 and 2019 IEPs is that "the 2019 IEP was proposed to be delivered in a less restrictive environment than the 2018 IEP", which the Parents endorse. *Id.* at 19 ¶ 30.

- PRIDE has "reasonable infection control protocols", including regular sanitation and exclusion or segregation of contagious staff and students, and its small size "renders screening of students and staff for possible contagion, as well as separation of the Student from those who are suspected of being contagious[,] roughly as feasible as at Meliora Academy." *Id.* at 19–20 ¶¶ 32, 34.

- Student would be exposed to "approximately the same number of staff members providing him with services" at PRIDE and "the same number of peers in his team or classroom group – seven at PRIDE and six at Meliora Academy." *Id.* at 20 ¶ 33.

- At PRIDE, Student would avoid exposure to contagion he experiences at Meliora, including sharing an entrance, hallways, and gym with fifty students and transportation in a van with other students for two hours each day. *Id.* at 20 ¶ 34.

- The IEP includes supports and services to address Student's needs around distractibility, including a "one to one paraprofessional, a behavior plan, a clear work area[,] and reduction of auditory or visual stimulation", in addition to a small, structured learning environment with divided workspaces. *Id.* at 20 ¶ 37.

But the Hearing Officer does not address other concerns raised regarding the appropriateness of the proposed IEP and placement, including the appropriateness of the timing of J.O.'s transition to the proposed PRIDE program. The district proposed to move J.O. to a new program in the middle of a school year, following a break in the school year occurring at April vacation. *See* Individualized Education Program at 3, ECF No. 26-20 (Jan. 30, 2019) ("B-46"). Meanwhile, there is evidence in the record that J.O. has substantial difficulty with transitions and, as a result, would be likely to regress if moved to another educational placement so close to the end of the school year. [8] *See* Letter from Maureen Onyirimba, M.D., ECF No. 26-20 (Jan. 29, 2019) ("B-45") (stating that Student "does not cope well with transitions" and advising against "[r]evising [Student's] placement [ ] close to the end of the school year").

The Student's progress reports also reflect increases in non-compliant behaviors associated with changes in his programming, including temporary sharing of a classroom or a new primary staff person. *See* Meliora Progress Report at 6, ECF No. 26-21 (Mar. 5, 2019) ("B-49"); *see also* T. 10/2/19 at 161–63; Admin. Hr'g Tr. at 46–47, ECF No. 26-7 (Dec. 2, 2019) ("T. 12/2/19"). While the appropriateness of the timing of the proposed transition for Student appears to have been discussed at the PPT meeting, *see* T. 10/2/19 at 128–29, and while the

---

[8] The Court notes that the record reflects that the two other letters provided by physicians were not read, much less considered or discussed, at the January 2019 IEP Team meeting, but rather merely received by the school district and placed in the Student's file. T.10/2/19: 77–78. The Court therefore finds that the Hearing Officer's conclusion that the letters were "considered", *see* Final Decision at 13 ¶ 61, is not supported by the preponderance of the evidence.

record does reflect that the District attempted to convene a transition planning meeting, *see id.* at 118–20, the Final Decision does not analyze the potential impact of the transition on Student, including any potential regression, when the Board proposed changing J.O.'s placement at the time that it did.[9]

The Hearing Officer's decision also did not address relevant differences between the 2018 and 2019 IEPs, including that the 2018 IEP calls for 1:1 ABA support, while the 2019 IEP calls for 1:1 support from a paraprofessional only. B-23 at 36; B-46 at 45. The 2018 IEP also provides for "consult services of up to 12 [hours] each for Speech [Therapy], [Physical Therapy], and [Occupational Therapy]". B-23 at 36. These consultation services are not accounted for in the 2019 IEP, which provides only for consult between the special education teacher and these related service providers for one hour per week, in addition to a BCBA consult two hours per month. B-46 at 45. Although the 2019 IEP provides that a "district speech-language consultant will oversee J.O.'s feeding program and training of staff", *see* B-46 at 2, the IEP does not allocate service or consultation service hours to this proposed programming, *see id*. at 45, 48. In addition, testimony at the hearing established that the speech-language consultant that the District intends to oversee J.O.'s feeding program only works in Connecticut two days per week, during which time she sees eighteen children. Admin. Hr'g Tr. at 49, ECF No. 26-10 (Feb. 12, 2020) ("T. 2/12/20").

Finally, the Final Decision lacks analysis as to additional, relevant evidence regarding the

---

[9] The Court further notes that, because discussion as to the transition plan did not occur as part of the Team's decision regarding the proposed placement change, but rather was proposed to occur at a later PPT meeting, it lacks any information on the record before it to assess whether the transition plan to Meliora was reasonably calculated to ensure that J.O. would make progress, rather than regress, as a result of the transition.

appropriateness of the proposed placement at PRIDE in light of J.O.'s medical needs.[10] The record reflects that, the last time he was in a public school setting, J.O. was placed on homebound tutoring because his immune system was not able to handle the public school environment. *See* Final Decision at 4 ¶ 7. While Student has been free of significant illnesses, including respiratory infections, since the 2016-2017 school year, he also has been at Meliora throughout that time. Final Decision at 4–5 ¶¶ 7, 8, 18. In addition, although the PRIDE program is small and self-contained, it is housed within Nayaug Elementary, where there is one nurse assigned to a building of approximately 500 students. *See* T.1/22/20: 129–30; Final Decision at 11 ¶ 50. Although there may be only seven or eight students[11] in the classroom where J.O. would be placed at PRIDE, the record reflects that these students spend as much as 80% of their time in the mainstream environment of Nayaug School, *see* Final Decision at 12 ¶¶ 53–54, resulting in potential, indirect exposure to disease and infection from more than the limited number of students in the PRIDE program.

In the absence of all of the analysis noted above, the Court cannot defer to the Hearing Officer's determination as to whether the proposed program provided a FAPE. *J.M. v. N.Y.C. Dep't of Educ.*, No. 12-CV-8504 (KPF), 2013 WL 5951436, at *17 (S.D.N.Y. Nov. 7, 2013) (A hearing officer's opinion "does not warrant deference from the Court" if it is not "analytically intensive", even if it is "long in its recitation of the testimonial evidence").

"A court may remand a proceeding when it needs further clarification or does not have

---

[10] The Court notes that the Hearing Officer did not analyze whether, under Section 504, as a reasonable accommodation for Student's immunocompromised condition, he required placement at Meliora. This claim was not raised on appeal, and, therefore, the Court does not address it here.

[11] The Court notes a discrepancy in the Final Decision as to the classroom size of the room in which J.O. would receive services at the PRIDE program. In her findings of fact, Hearing Officer Bird states that PRIDE currently serves ten students, eight of which work with one teacher, and the Student was to become part of the class group of eight students. Final Decision at 12 ¶ 53. Later in the decision, in the conclusions of law, Hearing Officer Bird states that Student would have seven peers in his team or classroom group. *Id.* at 20 ¶ 33.

sufficient guidance from the administrative agencies." *E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d

442, 463 (2d Cir. 2014) (quoting *T.L. v. N.Y.C. Dep't of Educ.*, 938 F. Supp. 2d 417, 436

(E.D.N.Y. 2013)). The appropriateness of a proposed IEP and placement "is a question this

Court is ill-equipped to decide in the first instance" and "involves important questions of

educational policy [that] require[] educational expertise to resolve." *J.F. v. N.Y.C. Dep't of*

*Educ.*, No. 12-CV-2184 (KBF), 2012 WL 5984915, at *10 (S.D.N.Y. Nov. 27, 2012). The Court

therefore finds that additional administrative proceedings in the matter are required to determine

whether the proposed programming provides FAPE, in light of all of the Student's relevant

circumstances, so as to permit a proper weighing of the preference in the IDEA for

mainstreaming "against the importance of providing an appropriate education to handicapped

students." *Newington*, 546 F.3d at 119.

Accordingly, the Hearing Officer's decision will be remanded for further administrative

proceedings consistent with this decision.

## V.      CONCLUSION

For the foregoing reasons, the parties' motions for summary judgment are **DENIED**, and

this proceeding is remanded to a state administrative hearing officer for additional findings

consistent with this Ruling and Order.

**SO ORDERED** at Bridgeport, Connecticut, this 29th day of December, 2021.

  /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge